### ORDER OF ST. BENEDICT

v.

### Robert GORDON, Tax Assessor.

No. 78–349–Appeal.

Supreme Court of Rhode Island.

July 15, 1980.

Jeremiah C. Lynch, Jr., Newport, for plaintiff.

Kenneth R. Tremblay, Portsmouth, for defendant.

## OPINION

KELLEHER, Justice.

The plaintiff, Order of St. Benedict (St. Benedict), is a nonbusiness corporation that owns and operates a boarding school for boys in Portsmouth. In 1974, 1975, 1976, and 1977, St. Benedict filed complaints in the Newport County Superior Court for relief from tax assessments made on certain of its real property in December of the year preceding each complaint. These complaints, which were consolidated for trial, questioned the validity of the assessments of the defendant tax assessor (the assessor)[1] for the town of Portsmouth, on both the faculty residences located in a new dor-

---

1. The defendant's predecessor was Ralph Borman. At the time of the December 31, 1973 assessment, a three-man elected board was responsible for tax assessments in Portsmouth. Sometime thereafter the three-person board was abolished, and the responsibility shared by the trio was conferred upon one individual.

mitory complex and the school hockey rink. St. Benedict argued that the hockey rink, valued at $665,755, was overassessed contrary to G.L.1956 (1970 Reenactment) § 44–5–12[2] and that the faculty living quarters, being used exclusively for educational purposes, were illegally assessed in violation of G.L.1956 (1970 Reenactment) § 44–3–3(8). Agreeing with both of these contentions, the trial justice found that the faculty living quarters were illegally assessed and determined that the hockey rink had a $505,000 fair market value as of December 31, 1973. Both parties appealed to this court.

St. Benedict first contends that the trial justice erred in denying its motion to amend the pleadings to conform to the evidence, to wit, certain testimony of Walter Snyder (Snyder). Snyder, a member of the three-man board formerly responsible for tax assessments in Portsmouth, stated that he did not take part in the December 31, 1973 assessment of the hockey rink. This testimony, according to St. Benedict, indicates that the hockey rink was assessed in violation of Rhode Island law, for the entire board did not participate in the decision-making process.

Despite the fact that proposed amendments under Super.R.Civ.P. 15(b) are permitted with liberality, the final decision whether to allow the amendment rests with the discretion of the trial justice. *Kenney v. Providence Gas Co.*, 118 R.I. 134, 372 A.2d 510 (1977). Pursuant to Rule 15(b), a motion to amend should be granted if an issue not raised by the pleadings has been tried by the express or implied consent of the parties or, if no such consent is present, when the

> "merits of the action will be subserved thereby and the [party objecting to the amendment] fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits."

In the instant case, the trial justice, in denying the motion made after both sides had rested, concluded that the parties were bound by a pretrial order that limited the triable issues concerning the hockey rink to overassessment.[3] He also found that the granting of such a motion would unfairly surprise the town and would impose "an unmeetable situation" upon it.

St. Benedict argues that under our decision in *Kenney*, which calls for a liberal approach to 15(b) motions, the trial justice abused his discretion in failing to grant its motion. We disagree. In *Kenney*, the defendant Providence Gas Company had some prior indication that the plaintiffs were pursuing a theory of recovery which was different from that set out in the pleadings. More importantly, we determined that although the defendant may have been caught off guard by the new evidence, any prejudice could have been cured by a brief continuance. This case, however, presents an entirely different fact-pattern, for there is no indication in the record that the assessor had any warning of St. Benedict's attempt to alter the course of trial specified in the pretrial order by introducing a completely novel issue. In addition, as the trial justice noted in his denial of the motion, the original suit concerning the hockey-rink overassessment went back over four years. The record also indicates that the member of the three-man board principally responsible for the determination of the 1973 assessment figure is deceased. In light of these circumstances, we cannot say that a brief continuance would have remedied the position of serious disadvantage in which the assessor would have found himself had he been forced to defend against the new allegation of the proposed amendment. Nor do we find that the trial justice clearly improperly exercised or abused his discretion in

---

2. This statute authorizes the municipal assessors to assess ratable property "at its full and fair cash value, or at a uniform percentage thereof." The $665,755 figure represents the board of assessors' estimate of the rink's full and fair cash value. Since the board was as-sessing at 70 per cent of full and fair cash value, the valuation was reduced by 30 per cent to $466,025.

3. This order was never formally entered into the record.

denying the motion. *Matracia v. Matracia,* R.I., 378 A.2d 1388 (1977).[4]

In the alternative, St. Benedict argues that its motion to amend should have been granted under the first part of Rule 15(b), for the issue of whether the entire board participated in the hockey-rink assessment was tried by the implied consent of the assessor. St. Benedict bases this contention on the following direct testimony of Snyder, a witness for the assessor:

"Q. Did you appraise that building [the hockey rink] on December 31, 1973?

"A. Not to my knowledge."

■■ The record reveals that this testimony, elicited also in cross-examination, was merely incidental to the main line of questioning concerning the method by which the board arrived at its 1972 and 1973 assessments of the hockey rink. The presence of this testimony, standing alone, does not convince us that the parties clearly understood that the evidence was aimed at the issue contained in St. Benedict's proposed amendment. Implied consent is not demonstrated by the mere fact that evidence relevant to an issue expressly embraced by the pleadings also implicitly suggests the unpleaded issue. *Kenney v. Providence Gas Co.,* 118 R.I. 134, 372 A.2d 510 (1977); *Soby Construction, Inc. v. Skjonsby Truck Line, Inc.,* 275 N.W.2d 336 (N.D.1979).

Both at trial and on appeal, St. Benedict argued that the hockey rink was assessed in excess of a uniform percentage applicable to other ratable property in Portsmouth. The trial justice apparently agreed with this contention, for he assigned the rink a fair market value of $505,000, $160,755 less than the original valuation of the tax board. At the outset of his decision, the trial justice mentioned the "comparable" approach to valuating property, stating that various states disapprove of this method under the theory that no two pieces of property are ever precisely the same. He then went on to discuss the testimony of St. Benedict's expert that the "income" approach to the

hockey-rink valuation produced a figure of $216,300. This latter method of valuation was deemed inappropriate, for the construction of the rink was not a true commercial venture. The trial justice also criticized the "cost" approach of the assessor's expert who testified that the rink should be valued at $738,000. This discussion is incomplete, however, in that it leaves us little guidance for reviewing the process by which the trial justice arrived at his $505,000 valuation figure.

■ Super.R.Civ.P. 52(a) requires a trial justice, sitting without a jury, to "find the facts specially and state separately [his] conclusions of law thereon * * *." This statutory language was discussed in *Rowell v. Kaplan,* 103 R.I. 60, 235 A.2d 91 (1967), wherein we stated that although

"we will not in every instance insist upon strict compliance with the fact-finding requirements of rule 52(a) * * * [w]e cannot be kept in the dark when we review, and noncompliance with the rule will entail the risk of reversal or remand unless the record will yield a full understanding and resolution of the controlling and essential factual and legal issues." *Id.* at 70, 235 A.2d at 97.

In this case, the controlling legal issue with respect to the hockey rink was whether or not it was overassessed. On the record before us, we can only conclude that the trial justice decided that the rink was overassessed, for he assigned it a lower value than the town's tax board. Although we do know that the trial justice disapproved of the valuation figures presented by the witnesses, we are unaware of the approach eventually employed to calculate the ultimate $505,000 valuation figure and of the reasoning behind the legal conclusion that the hockey rink was overassessed. The trial justice's brief explanation that he was attempting to "do justice" in selecting the $505,000 figure leaves us, in the words of *Rowell,* "in the dark." The case must, therefore, be remanded for further explana-

---

4. In light of our disposition of this case, we do not address the question of whether a pretrial order limiting the triable issues in a case automatically forecloses an amendment to the pleadings to conform to the evidence under Super.R.Civ.P. 15(b).

tion of the factual basis for the ultimate conclusion that the hockey rink was overassessed.

■ The assessor's appeal is based on the contention that the trial justice erred in finding that the lay-faculty living quarters of St. Benedict's new dormitory complex were assessed in a manner contrary to § 44–3–3(8).[5] The dormitory complex, constructed in 1973, contains three separate units, each of which has facilities for both students and the masters who supervise them. The entire complex houses three single lay masters and the families of three married masters who occupy the building year-round on a rent-free basis. Father Peter Sidler, treasurer of the Order of St. Benedict in Portsmouth, testified that these faculty members maintain discipline in the dormitory, tutor, dine regularly with the students, and furnish a certain amount of social life. He further explained that

> "the boys [are] under our supervision * * * twenty-four hours a day, and if they're introduced into family life of the housemaster * * * or if they're asked in for a meal or tea or something, * * we would consider that part of their Portsmouth education. We couldn't operate if there were no faculty on the campus."

At the close of testimony, the trial justice determined that the faculty living quarters met the requirement of § 44–3–3(8) that they be used "exclusively for educational purposes" and were, therefore, exempt from taxation. He based his conclusion on the reasoning that "[t]he plaintiff is a boarding school and could not possibly operate as such without constant supervision by and availability of teachers living with high school age students in the dormitories." Whereas the assessor agrees that the living quarters are used for an educational purpose, he contends that since the masters and their families are also housed therein, a second purpose is served which is not exclu-

sively educational. He argues that the cases of *Sisterhood of Holy Nativity v. Tax Assessors*, 73 R.I. 445, 57 A.2d 184 (1948), *City of Pawtucket, for Opinion*, 24 R.I. 86, 52 A. 679 (1902), and *St. Joseph's Church v. Assessors of Taxes*, 12 R.I. 19 (1878), support the contention that this additional residential purpose disqualifies the faculty apartments from receiving a tax-exempt status. We disagree.

In the cases cited above, the incidental use of portions of the buildings in question as dwellings was primarily designed to benefit the residents because their actual occupation of the facility was not necessary to its operation. Thus, although the building may have served a religious or educational purpose, this purpose was not an exclusive one. In *Sisterhood of Holy Nativity*, for example, the court emphasized the fact that the nuns and an occasional guest slept in the assessed property; it was, therefore, not used exclusively for religious purposes despite the fact that the building was also used for the instruction of the children in the parish church, for retreats for women, and for conferences of a religious nature. The court in that case, applying the rule that tax-exemption statutes are strictly construed in favor of the taxing authority, rejected the plaintiff's claim that a property's primary use should prevail over its secondary use in determining whether property is entitled to exemption from taxation.

Despite the fact that St. Benedict's dormitory complex provides residences for certain faculty members and their families, this "incidental" use of the property does not defeat its tax-exempt status, for the use is itself exclusively educational. As the trial justice noted in his decision, without the supervision of boarding students by the masters on a twenty-four-hour basis, the school simply could not operate. We recognize that the educational function of a boarding school differs remarkably from

---

5. General Laws 1956 (1970 Reenactment) § 44–3–3(8) exempts from taxation "the buildings and personal estate owned by any corporation used for a school, academy or seminary of learning, and of any incorporated public chari-

table institutions, and the land upon which said buildings stand and immediately surrounding the same to an extent not exceeding one (1) acre, so far as the same is used exclusively for educational purposes * * *."

that of other educational institutions in that the educational process is not limited to actual classroom instruction. Rather, as in the case of St. Benedict, the process continues into the dormitory where the school attempts to provide guidance, supervision, and exposure to family life. In order to promote the ends sought to be achieved by St. Benedict's program, the type of constant interaction between faculty and students which can only be provided by the masters' actual occupation of the dormitory is required.

We endorse the sentiments expressed by the Kansas Supreme Court over half a century ago when, in considering the assessment of the residence occupied by the president of Kansas Wesleyan University, the court observed,

> "Obviously the occupancy of property as a residence by the president of a school and his family does not in and of itself constitute its use for educational purposes. But neither is it inconsistent with its exclusive use in that way. Where such occupancy is for the benefit of the school rather than of the occupant—is intended to serve the ends for which the school is maintained, is adapted thereto and actually accomplishes that object—it becomes in itself an exclusively educational use."

*Kansas Wesleyan University v. Board of Comm'rs*, 120 Kan. 496, 497, 243 P. 1055, 1055 (1926).

The plaintiff's appeal is sustained; the assessor's appeal is denied and dismissed; so much of the judgment appealed from as relates to the $505,000 valuation is vacated; and the case is remanded to the Superior Court for further proceedings.