Susan J. WILSON et al.

v.

Charles J. KRASNOFF d/b/a Slade Real Estate and Development Co.

v.

Edwin G. SINGSEN et al.

No. 88–81–Appeal.

Supreme Court of Rhode Island.

June 20, 1989.

**336**

Joseph V. Cavanagh, Jr., Blish & Cavanagh, Gerald C. DeMaria and James A. Ruggieri, Higgins, Cavanagh & Cooney, Providence, for plaintiff.

Thomas D. Gidley, Gidley, Lovegreen & Sarli, Joseph A. Kelly, Carroll, Kelly & Murphy, Berndt W. Anderson, Roberts, Carroll, Feldstein & Tucker, Inc., Providence, for defendants.

## OPINION

MURRAY, Justice.

This case is an appeal from a Superior Court judgment by the third-party plaintiff, Charles J. Krasnoff. In the original action, Susan Wilson fell and injured her back and leg on the stairway of a building owned by Krasnoff. Wilson and her husband sued Krasnoff. They later brought a second action against three doctors who treated Wilson for her leg and back injuries. These three physicians are the third-party defendants in the present action, Dr. Edwin G. Singsen, Dr. Touissant A. LeClercq, and Dr. Elie J. Cohen. In the first action, Krasnoff filed a third-party complaint against the doctors. The Wilsons settled their claims against Krasnoff and the three doctors. Thus the Wilsons are not parties in the present case. The third-party action, however, went to trial and is the case presently before us.

In the third-party action, Krasnoff claimed a right to statutory contribution and/or indemnity under the Uniform Contribution among Tortfeasors Act, G.L.1956 (1985 Reenactment) §§ 10-6-1 to 10-6-11. At the close of third-party plaintiff's case, four motions were made. First, Krasnoff made a motion to amend the complaint to add a claim for common-law indemnity. This motion to amend was denied. The other three motions were for a directed verdict made by each of the physicians. All of these motions were granted. The third-party plaintiff appeals, claiming that the rulings on the four motions were error. We affirm the judgment below in its entirety.

The following facts are found in the record. The first event was Susan Wilson's fall. Susan Wilson worked for the Office of Hearings and Appeals for the Social Security Administration. The office was located in the Slade Building, which was undergoing extensive renovations. A coworker of Wilson's testified that at the time of the accident the back stairs of the building were in disrepair. He stated that he had reported the dangerous condition of the stairs and that the lip of one of the stairs had cracked completely off and was missing. Wilson also testified that the stairs were in disrepair, and that she had a vivid memory of her fall. She recounted that on June 5, 1981, she fell when she placed her foot on the step that was missing the lip and her foot flew out from under her. Wilson injured her back and leg in the fall.

The second relevant occurrence was Dr. Singsen's and Dr. Cohen's treatment of Wilson. On June 7, 1981, Wilson was admitted to Newport Hospital in Newport, Rhode Island, as a patient of Singsen. Wilson was suffering from severe back and leg pain. For her pain, Wilson was given morphine or Demerol, and probably Valium. She was given this medication up until the time of surgery. On the morning of June 13, 1981, Singsen visited Wilson in her hospital room. According to Wilson, he did not inform her at that time or any time previously that he was contemplating surgery. At approximately 4 p.m., Dr. Cohen came in and examined Wilson for about forty minutes. After the examination, Cohen recommended to Singsen that Wilson undergo surgery. At about 4:45 p.m., Wilson's dinner was served to her on a tray. Wilson testified that after she had taken a couple of bites of food, a nurse came into the room and grabbed the tray away from Wilson. The nurse told Wilson not to eat because she was going to surgery that evening, and took a fork with food on it out of Wilson's hand. Wilson testified that the nurse's statements were the first information she had received about the possibility of surgery. Singsen telephoned Wilson and said that surgery would have to be done that evening. At approximately 9 p.m., Singsen came to visit Wilson with papers for her to sign authorizing the operation. He told Wilson that a disk would have to be removed in her back or she could be permanently paralyzed. Wilson testified that she told Singsen that she did not want surgery, and questioned him as to whether there wasn't some alternative. Singsen replied that surgery was necessary or she would be permanently paralyzed. Wilson acquiesced, signed the papers, and the surgery began at 10:30 p.m. Singsen, with Cohen assisting, performed a laminectomy and diskectomy. A laminectomy is the removal of the lamina, one of the bones of the spine. A diskectomy is the removal of a cartilage disk from the spine.

When Singsen testified in regard to Wilson's surgery, he stated that he had discussed the possibility of surgery with Wilson prior to the evening it was done. Singsen disputed whether by 8 a.m. on June 13, 1981, he had ordered Wilson scrubbed for surgery. Counsel for the third-party plaintiff asked Singsen if he had decided to operate before bringing in Cohen as a consultant, and whether the purpose of the consultation was to bolster the medical records in case Singsen's judgment was questioned. Singsen denied these assertions. Counsel then read into the record the following colloquy from a deposition of Singsen:

"Q: [I]s the purpose of the consultant to * * * determine whether to do the disk operation?

"A: It's often just to further document the seriousness of the problem.

"Q: Why do you have to document it * * * ?

"A: It's so that * * * there is more than one opinion on the chart, so in the future * * * somebody can't say, 'Well, that was just your opinion, Doctor.'"

After reading from the deposition, counsel asked Singsen whether it had been read correctly. Singsen acknowledged that it had been. The third-party plaintiff's counsel made an offer of proof of expert testimony. The expert testimony would have been based upon x-rays, medical reports, hospital records, depositions, and other doc-

uments. The expert would have opined that when Susan Wilson fell she merely strained her back, that this strain was not a permanent injury, and that the surgery performed was unnecessary.

The third event occurred in November of 1981 when Wilson either reinjured her back getting off the toilet in the bathroom of her home or had a relapse of her previous condition. She suffered from constant and excruciating back and leg pain. In December of 1981 she was again hospitalized under Singsen's care, but after her discharge her pain persisted. Wilson stated that the pain became so severe that it was difficult for her to function. Since her fall, Wilson had not returned to work and was unable to do household chores in a normal manner. She stated that she was unable to concentrate sufficiently to read or even to watch television. Wilson testified:

"I remember having to strain to even listen to someone because I was hurting so much; it would just take my concentration away."

Wilson later sought treatment from Dr. Touissant LeClercq.

The fourth occurrence was LeClercq's treatment of Wilson. The Pain Clinic, Ltd., specialized in treating individuals with severe, chronic, back pain and was headed by LeClercq. Wilson first visited the clinic on January 29, 1982. LeClercq believed that Wilson's pain was caused by a herniated disk Wilson suffered after the bathroom incident in November. He performed further surgery and a spinal fusion. A spinal fusion is an operation in which vertebrae in the spine that were previously separate are fused. The third-party plaintiff's counsel made an offer of proof of expert testimony regarding LeClercq's treatment of Wilson. The expert would have opined that the November bathroom incident was also a strain and that, among other items of malpractice, the spinal fusion was unnecessary. Wilson testified that following the surgery, she complained to LeClercq from her hospital bed of numbness in her legs. LeClercq responded by looking up at the ceiling and stating "will whoever is holding Susan Wilson's legs please let them go." At trial, LeClercq denied having made this state-ment. Susan Wilson's hospital roommate, however, testified that she was present when LeClercq made the statement and her account was the same as Wilson's. Since this surgery, Wilson primarily has been confined to a wheelchair.

Wilson and her husband sued the owner of the building and three doctors who treated Wilson in two separate actions. After negotiations, the Wilsons settled their lawsuits, and released all four defendants (Krasnoff, Singsen, Cohen, and LeClercq) for one lump sum. This lump sum was paid by Krasnoff's liability-insurance carrier. Krasnoff then proceeded with his third-party action against the three physicians. The case was tried as an action for statutory contribution and/or indemnity under the Uniform Contribution among Tortfeasors Act §§ 10–6–1 to 10–6–11. At the close of his case, third-party plaintiff moved to amend his complaint to add a claim for common-law indemnity. The trial justice denied the motion. At this time, each of the doctors made a motion for a directed verdict. The trial justice granted each of these motions on the grounds that plaintiff had failed to establish a prima facie case of either contribution or indemnity under §§ 10–6–1 to 10–6–11.

There are five issues presented by this appeal. These are, first, what is the definition of a joint tortfeasor under the Uniform Contribution among Tortfeasors Act (the act), and second, whether third-party plaintiff placed sufficient evidence in the record to make a prima facie case of common-law indemnity. The third issue is whether the act creates a statutory right of indemnity and the fourth is whether the trial justice erred by denying third-party plaintiff's motion to amend his complaint. The fifth issue is whether the trial justice erred by granting third-party defendants' motions for a directed verdict. The parties also briefed and argued the issue of whether the standard of due care for medical treatment in Rhode Island is a local or a national standard. In reviewing the present case, however, it is unnecessary to consider this issue and it is not reached.

I

The first issue is the definition of a joint tortfeasor under the Uniform Contribution among Tortfeasors Act, §§ 10-6-1 to 10-6-11. The 1939 Uniform Contribution among Tortfeasors Act was drafted by the National Conference of Commissioners on Uniform State Laws. *Joint Tortfeasors-Contribution-Release-Common Law Abrogated*, 43 B.U.L. Rev. 417, 418 (1963). The purpose of the act is to avoid the injustice of having one joint tortfeasor pay more than his or her fair share of damages. *Campo v. Taboada*, 720 P.2d 181, 183 (Haw.1986). Rhode Island first enacted its version of the act in 1940. *See Zarrella v. Miller*, 100 R.I. 545, 549, 217 A.2d 673, 676 (1966). As the act applies to joint tortfeasors, the definition of joint tortfeasor under the act will determine the act's scope.

■ To construct the meaning of a statute, we must first examine the statutory language. If the language of the statute is clear and unambiguous, it must be interpreted in accord with its plain meaning. *See Smith v. Raparot*, 101 R.I. 565, 567, 225 A.2d 666, 667 (1967). Section 10-6-2 sets forth the following definition:

> " 'joint tortfeasors' means two (2) or more persons jointly or severally liable in tort for the *same injury* to person * * *." (Emphasis added.)

Upon examining the statutory language, we discern two requirements in order for parties to be joint tortfeasors under the act. First, the parties must be "liable in tort." The phrase "liable in tort" has been construed to mean to have negligently contributed to another's injury. *Zarrella v. Miller*, 100 R.I. at 548, 217 A.2d at 675. Second, the statute refers to the same injury. The same injury is caused by parties who engage in common wrongs. To constitute joint tortfeasors under the act, both parties must have engaged in common wrongs.

■ We are aware that the act could be construed to mean that only the first requirement is necessary for parties to be deemed joint tortfeasors. Indeed, federal courts have interpreted our Rhode Island statute in this way. *Day v. J. Brendan Wynne, D.O., Inc.*, 702 F.2d 10, 12 (1st Cir.1983); *New Amsterdam Casualty Co. v. Holmes*, 435 F.2d 1232, 1234 (1st Cir. 1970). We note, however, that a federal court's interpretation of Rhode Island law is not binding upon us. We believe that this interpretation does not give meaning to the statutory language "same injury."

We find the approach of some Pennsylvania courts illustrative of the concept of common wrong. A case we find well reasoned is *Lasprogata v. Qualls*, 263 Pa.Super. 174, 397 A.2d 803 (1979). In *Lasprogata*, the plaintiff was involved in an automobile accident in which two vehicles collided. As a result of the accident, the plaintiff suffered a broken leg. *Id.* at 177, 397 A.2d at 804. The plaintiff underwent surgery during which a metal plate was inserted in his leg. He later claimed that this surgery constituted malpractice. *Id.* at 177-78, 397 A.2d at 804-05. The plaintiff settled his claim with the driver of the other vehicle, and brought suit against the physician who performed the surgery. *Id.* at 177, 397 A.2d at 804. The physician joined the driver of the other vehicle, based in part on a claim for contribution under Pennsylvania's version of the Uniform Contribution among Tortfeasors Act. *Id.* at 177-78, 180, 397 A.2d at 804-06. The Superior Court of Pennsylvania, sitting in a panel of three justices undertaking appellate review, held that under Pennsylvania's version of the act the original wrongdoer and the physician were not joint tortfeasors and no right of contribution existed between them. The court stated:

> "[A] tortfeasor originally causing an injury and a physician who subsequently * * * causes a new injury are *not* joint tortfeasors." *Id.* at 179, 397 A.2d at 805.

The court pointed out that the acts of the original wrongdoer and the negligent doctor occurred at different times and that neither had the opportunity to guard against the other's negligence. *Id.; see also Buttermore v. Aliquippa Hosp.*, 368 Pa.Super. 49, 533 A.2d 481 (1987).

Several Rhode Island cases set forth circumstances in which parties will be deemed

joint tortfeasors under the act. For instance, among those occurrences held to constitute a common wrong are a single automobile collision, *Smith v. Raparot*, 101 R.I. at 566, 225 A.2d at 666; *Zarrella v. Miller*, 100 R.I. at 546, 217 A.2d at 674, and an assault and battery. *Sousa v. Casey*, 111 R.I. 623, 628–31, 306 A.2d 186, 189–91 (1973). In determining whether an occurrence between two or more parties is a common wrong, two important factors will be the time at which each party acted or failed to act and whether a party had the ability to guard against the negligence of the other.

When considering the act, it is helpful to contrast the liability of a tortfeasor to a plaintiff under general common-law principles with the liability of joint tortfeasors to each other under the act. The Uniform Contribution among Tortfeasors Act addresses the relationship between actual or potential defendant joint tortfeasors. The language of the act itself speaks in such terms. The act does not, however, concern the topic of tortfeasors' liability to an injured plaintiff. *Bartlett v. New Mexico Welding Supply, Inc.*, 98 N.M. 152, 154–55, 646 P.2d 579, 581–82 (N.M.Ct.App.1982). Under general common-law principles of tort causation, a plaintiff may sue an initial tortfeasor for the full amount of damages even though some portion of the damages may be attributable to subsequent tortfeasors. In some jurisdictions this principle applies to situations in which an initial injury is aggravated by subsequent medical malpractice. The Restatement (Second) *Torts* § 457 (1965) states:

> "If the negligent actor is liable for another's bodily injury, he is also subject to liability for any additional bodily harm resulting from normal efforts of third persons in rendering aid which the other's injury reasonably requires * * *."

Under this rule, the plaintiff may bring suit against the original tortfeasor and obtain full satisfaction from that tortfeasor even though one or more subsequent tortfeasors aggravated the injury through medical malpractice. Rhode Island law, however, rejects this rule as being inherently unsound. Under Rhode Island law, a tortfeasor is liable only for the injury caused by his or her negligence. An initial tortfeasor is not liable for additional harm caused by subsequent medical malpractice as such malpractice is an independent intervening cause.

In the instant case, to determine whether Krasnoff, Singsen, Cohen, and LeClercq are joint tortfeasors under the act, we first must determine whether each of the parties is "liable in tort" within the meaning of the act. "Liable in tort" means that their negligence contributed to Wilson's injuries. Assuming arguendo that the negligence of each of the four parties did contribute to Wilson's injuries, we must consider whether they engaged in common wrongs. To consider whether they engaged in common wrongs, the time of the allegedly tortious conduct and each party's opportunity to guard against the others' negligence must be considered.

We first consider at what point the allegedly tortious conduct occurred. June 5, 1981 was when Wilson fell on the stairs. June 13, 1981 was when Singsen and Cohen performed surgery on Wilson. It was November of 1981 when Wilson either reinjured herself or her condition regressed while getting up from the toilet. It was May 6, 1982 when LeClercq performed a spinal fusion on Wilson. Upon examining these dates, Krasnoff's allegedly tortious conduct occurred at a different time from that of any of the doctors. As between the physicians, their allegedly tortious conduct also occurred at distinct times with the exception of Singsen and Cohen. Singsen and Cohen acted within the same time frame as together they performed surgery on Wilson on June 13, 1981.

Next we consider the opportunity of each joint tortfeasor to guard against the negligence of the other or others. Krasnoff, the building owner, had possession and control of the stairs in the building in which Wilson worked. None of the other defendants had control over or knowledge of the condition of the stairs. Thus the physicians did not have the opportunity to guard against Krasnoff's negligence. Similarly, Krasnoff had no opportunity to guard against the negligence of the doctors.

Each physician conducted his own treatment of Wilson, with the exception of Singsen and Cohen. Together Singsen and Cohen performed surgery on Wilson and thus had the opportunity to guard against each other's negligence. Singsen and Cohen, if both had been found to have negligently contributed to Wilson's injuries, are joint tortfeasors within the meaning of the act. However, none of the other four parties to this action are joint tortfeasors under the act. Further, we note that had Wilson pursued her action against Krasnoff, he would be liable for only the injury caused by his negligence regarding the condition of the stairs and would not be liable for injury caused by subsequent medical malpractice.

## II

The second issue is whether the third-party plaintiff placed sufficient evidence in the record to make a prima facie case of common-law indemnity. We first consider the definition of common-law indemnity.

■ At common law, a right to indemnity is generally contractual in nature. However, it is held that indemnity may also be based on equitable principles. *Helgerson v. Mammoth Mart, Inc.,* 114 R.I. 438, 441, 335 A.2d 339, 341 (1975). For example, an equitable right to indemnity exists when one has been held liable solely because of the wrongful act of another. *Muldowney v. Weatherking Products, Inc.,* 509 A.2d 441, 443 (R.I.1986). Under *Muldowney,* there are three elements to a claim for equitable indemnity. These three elements are first, the party seeking indemnity must be liable to a third party, second, the prospective indemnitor must also be liable to the third party, and third, as between the prospective indemnitor and indemnitee, equity requires the obligation be discharged by the potential indemnitor. *Id.* One situation satisfying this third element is when a potential indemnitor is at fault and the prospective indemnitee is blameless. *Id.* at 444.

■ We now turn to an examination of whether the facts of the present case set forth a prima facie case of common-law indemnity. There was no evidence in the record that suggests a contractual basis for indemnity. As to a claim for equitable indemnity, the facts in the record also do not set forth a prima facie case nor could they upon the facts of this case. To satisfy the first element of equitable indemnity, Krasnoff must be liable to Wilson. To fulfill the second element the physicians also must be liable to Wilson. Even if one assumes that these first two elements were shown, we believe that the third element was not met. The third element is that equity requires that the obligation be discharged by the doctors. Circumstances in which equity would require the obligation to be discharged by the physicians would be if they were culpable and Krasnoff were blameless. However, Krasnoff himself has asserted that he was negligent. His negligence is the basis upon which he maintains that he has satisfied the first element, that he is liable to a third party. Thus plaintiff did not set forth a prima facie case of common-law indemnity.

## III

■ The third issue is whether the Uniform Contribution among Tortfeasors Act creates a statutory cause of action of indemnity. The act has eleven sections, beginning at § 10–6–1 and ending with § 10–6–11. Only one section addresses the topic of indemnity, § 10–6–9. It provides in full:

> "Right of indemnity preserved.—This chapter does not impair any right of indemnity under existing law."

This section preserves a right of action for indemnity which is already in existence. As discussed above, there is a right of indemnity under Rhode Island common law, and the plain meaning of this provision is that the common-law right will be preserved. There is no other language or implication that could be construed to create a statutory right of indemnity. Accordingly we hold that there is no cause of action of statutory indemnity under the Uniform Contribution among Tortfeasors Act.

In regard to the instant case, a statutory right of indemnity under §§ 10–6–1 to 10–6–11 does not exist as a matter of law. Therefore the issue of whether facts setting forth such a claim were placed in the record is moot.

## IV

 The fourth issue is whether the trial justice erred by denying third-party plaintiff's motion to amend his complaint. The amendment of a complaint is allowed under Rule 15 of the Superior Court Rules of Civil Procedure. Rule 15(b) mandates the liberal allowance of amendments to bring pleadings into conformity with the evidence offered. *Duquette v. Godbout*, 416 A.2d 669, 672 (R.I.1980). Despite the fact that proposed amendments under Rule 15(b) are permitted with liberality, the final decision whether to allow an amendment rests within the discretion of the trial court. *Order of St. Benedict v. Gordon*, 417 A.2d 881, 883 (R.I.1980). A trial justice's ruling on a motion for leave to amend will not be disturbed unless it constitutes an abuse of discretion. *McVeigh v. McCullough*, 96 R.I. 412, 423–24, 192 A.2d 437, 444 (1963).

In the case at bar, we have discussed Krasnoff's claim for common-law indemnity and found it to be untenable upon the facts of this case. Thus it would be impossible to amend the complaint to conform to evidence offered that sets forth a claim for common-law indemnity as there was no such evidence offered. The trial justice's denial of the motion to amend the complaint to add a claim for common-law indemnity was not an abuse of discretion.

## V

The fifth issue is whether the trial justice erred in granting third-party defendants' motions for a directed verdict. In ruling on a defendant's motion for a directed verdict in a civil action, a trial justice must examine the evidence in the light most favorable to the plaintiff, without examining its credibility, and draw all reasonable inferences in the plaintiff's favor. *Lamoureux v. Davis*, 504 A.2d 449, 451 (R.I.1986). A trial justice must deny the motion for a directed verdict if there is evidence that would support a verdict in favor of the plaintiff or evidence upon which reasonable minds could differ. *Id.*

In the instant case, after the third-party plaintiff had rested, each defendant moved for a directed verdict. The third-party plaintiff's claims were based on statutory contribution and statutory indemnity. However, the third-party plaintiff did not set forth a prima facie case of statutory contribution as he was not a joint tortfeasor with the third-party defendants. Statutory indemnity under §§ 10–6–1 to 10–6–11 does not exist as a matter of law. Thus there was insufficient evidence to support a verdict for the third-party plaintiff. The trial justice did not err in granting the motions for a directed verdict.

The third-party plaintiff's appeal is denied and dismissed. The judgment of the Superior Court is affirmed. The papers of this case are remanded to the Superior Court.

KELLEHER, J., did not participate.