**UNITED STATES of America**

v.

**William M. DAVIS, et al.**

v.

**AMERICAN CYANAMID, et al.**

**C.A. No. 90–484–T.**

United States District Court,
D. Rhode Island.

Sept. 28, 1998.

Everett C. Sammartino, United States Attorney's Office, Providence, RI, Patricia Sims, U.S. EPA Office of Enforcement, Richard B. Stewart, U.S. Department of Justice, Environmental Enforcement, Washington, DC, Julie Taylor, U.S. EPA Office of Regional Counsel, Boston, MA, Brian E. Burke, Robert E. Maher, Jr., Cynthia S. Huber, U.S. Dept. of Justice/Env., Enforcement Sect., Land and Natural Resources, Richard H. Boote, Timothy K. Webster, Jason W. Feingold, Environmental Enforcement Section, Environment & Natural Resources Div., U.S. Dept. of Justice, Washington, DC, for United States of America, plaintiff.

Thomas C. Angelone, Steven I. Rosenbaum, Charles P. Cavas, Hodosh, Spinella & Angelone, Providence, RI, S. Paul Ryan, East Providence, RI, R. Bradford Fawley, Downs, Rachlin & Martin, Brattleboro, VT, Peter Kunin, Lawrence H. Meier, Marc B. Heath, Downs, Rachlin & Martin, Burlington, VT, Robert Miller, Charles N. Hurt, Jr., James C. Gallagher, Downs, Rachlin & Martin, St. Johnsbury, VT, Timothy A. Vanderver, Jr., Russell V. Randle, Thomas C. Downs, Patton Boggs, L.L.P., Washington, DC, for William M. Davis, Eleanor Davis, A. Capuano Brothers, Inc., United Sanitation, Inc., United Technologies Corporation, defendants.

## MEMORANDUM AND ORDER

TORRES, District Judge.

United Technologies Corp. ("UTC") seeks contribution pursuant to § 113(f)(1) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9613(f)(1), from seventeen parties (the "defendants")[1] that UTC claims share liability for the costs incurred in cleaning up a hazardous waste site. The defendants include those who allegedly generated hazardous wastes found at the site (the "generator defendants")[2] and those who allegedly transported hazardous waste to the site for disposal (the "transporter defendants").[3] In addition to its claim for contribution, UTC seeks indemnity and a declaratory judgment allocating responsibility among the parties for future cleanup costs.

The case was tried to the Court sitting without a jury. When UTC rested, thirteen of the defendants moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 52(c).[4] The Court rendered a bench decision granting some of those motions and denying others.

Because the motions raise important issues regarding the CERCLA liability of municipalities and transporters of hazardous waste and because there is very little authority addressing those issues, the Court is entering its order in the form of this Memorandum and Order.

### Background

The facts giving rise to this litigation are recited in *United States v. Davis*, 11 F.Supp.2d 183, 185–87 (D.R.I.1998). For present purposes, it is sufficient to say that in the first phase of the case, UTC was found liable to the United States for all past and future response costs incurred in cleaning up a hazardous waste site in Smithfield, Rhode Island, known as the Davis Liquid Site (the "Davis Site" or the "Site"). UTC and the

---

1. The defendants are: William Davis; Eleanor Davis; Macera Brothers Container Service, Inc., Robert Cece, and Michael Macera (collectively the "Macera defendants"); BFI Waste Systems of North America ("BFI"); Michael Musillo; Drum Automation; ACCO–Bristol Div. of Babcock Indust. ("ACCO–Bristol"); Ashland, Inc. ("Ashland"); Gar Electroforming, n/k/a Black & Decker ("Gar"); Giering Metal Finishing ("Giering"); Instapak, n/k/a Sealed Air Corp. ("Instapak"); The City of Jersey City, New Jersey ("Jersey City"); Morton International, Inc. ("Morton"); Perkin–Elmer Corp. ("Perkin–Elmer"); and Waterbury Plating Co. ("Waterbury Plating").

2. The generator defendants are: ACCO–Bristol; Ashland; Gar; Giering; Instapak; Jersey City; Morton; Perkin–Elmer; and Waterbury Plating.

3. The transporter defendants are: the Macera defendants; BFI; Michael Musillo; and Drum Automation.

4. William Davis, Eleanor Davis, Michael Musillo and Drum Automation did not join in these motions.

government later entered into a settlement agreement calling for UTC to underwrite approximately $16.8 million of the estimated $55 million in response costs.[5]

In this phase of the case, UTC sought contribution pursuant to § 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), from seventeen of 142 potentially responsible parties (PRP's)[6] for expenses actually incurred prior to September 13, 1996.[7] In addition, UTC sought both indemnification for any cleanup costs that it incurs and a declaratory judgment allocating responsibility among the parties for future cleanup costs.

UTC's contribution claim for costs incurred prior to September 13, 1996 was dismissed because UTC incurred no expenses before that time. UTC's indemnification claims previously were dismissed for the same reason, and because, in the absence of either an agreement to indemnify or circumstances dictating that the remediation costs should be borne entirely by the other PRP's, UTC was not entitled to indemnification under Rhode Island law. *See Fish v. Burns Bros. Donut Shop, Inc.*, 617 A.2d 874, 875 (R.I.1992); *Wilson v. Krasnoff*, 560 A.2d 335, 341 (R.I.1989); *Muldowney v. Weatherking Prods., Inc.*, 509 A.2d 441, 443 (R.I.1986). Accordingly, the issue presented is whether, pursuant to Rule 52(c), judgment on partial findings should enter in favor of the defendants with respect to UTC's request for a declaratory judgment allocating responsibility for future remediation costs.

The defendants argue that they are entitled to judgment on a variety of grounds. All of the defendants assert that UTC has failed to prove that it is being required to pay more than its *pro rata* share of the

cleanup costs. In addition, the generator defendants contend that UTC has failed to prove that any of their wastes were deposited at the Davis Site. BFI and the Macera defendants[8] also contend that, under 42 U.S.C. § 9607(a)(4), they cannot be held liable as transporters because Macera Brothers did not "select" that site.[9] Finally, Jersey City contends that, because it made arrangements to dispose of waste "in response to an emergency" created by a third party, 42 U.S.C. § 9607(d)(2) exempts it from liability.

### Findings of Fact

After listening to the evidence presented during twenty-six days of trial, I hereby find the relevant facts to be as follows. During 1976 and most of 1977, William M. Davis operated a chemical waste disposal site known as the Davis Liquid Site on land owned by him and his wife, Eleanor Davis, in Smithfield, Rhode Island. During that period, wastes containing a variety of hazardous chemicals were deposited at the Site, primarily by four transporters: Chemical Control Corp. ("CCC"), Chemical Waste Removal, Inc. ("CWR"), Macera Brothers, and A. Capuano Bros., Inc./United Sanitation, Inc. ("Capuano"). The defendants, the other PRP's and UTC were among several hundred customers from which the transporters received waste containing hazardous chemicals of the kind deposited at the Site.

The businesses of CCC and CWR included hauling waste to various landfills and other facilities for disposal. They were referred to the Davis Site by the Capuanos, the operators of Sanitary Landfill, a facility to which CCC and CWR usually brought their waste.

Macera Brothers hauled waste to various facilities for disposal. Sometime in 1976,

---

5. The estimated response costs consist of $49 million in cleanup costs and $6 million in enforcement costs incurred by the Department of Justice.

6. Ten of the PRP's have been defaulted and three of the PRP's have been dismissed on summary judgment. The claims against the remaining PRP's have been dismissed because settlements with them either have been approved or are pending approval by the Court.

7. That is the cut-off date established by the Court because it coincided with the closure of discovery.

8. BFI is the alleged corporate successor to Macera Brothers Container Service, Inc., ("Macera Brothers") by virtue of its acquisition of M & C Enterprises, Inc. in 1987.

9. Macera Brothers is the company that allegedly transported waste to the Davis Site. The remaining Macera defendants were principals of Macera Brothers.

Robert Cece, a principal in Macera Brothers and a longtime acquaintance of William Davis, approached Davis to inquire about the possibility of disposing barrels of waste at the Davis Site. Davis was receptive to the idea and, after some discussion, an agreement was reached regarding the price. Shortly thereafter, Macera Brothers began delivering fifty-five-gallon drums containing a brown, waxy substance that smelled like solvent and was very similar in appearance to waste generated by the Pratt & Whitney Division of UTC. Some of the drums bore Pratt & Whitney labels.

Generally, when waste was deposited, Davis completed a "receipt" by writing down the date, the name of the transporter and the quantity of waste delivered. In most cases, he required the driver to sign the receipt. Receipts for the period between January 11 and July 7 of 1977 were admitted into evidence, but the remaining receipts were lost during previous state court litigation regarding the Site.

Most of the waste deposited at the Site was in liquid form and was delivered in either tanker trucks, fifty-five-gallon drums that had been loaded on flatbed trailers, or a variety of smaller containers ranging from five-gallon cans to laboratory-sized vials and jars.

The contents of the tankers were emptied into large pits, and they eventually percolated down into the soil. The liquid contents of the drums and some of the smaller containers also were poured into the pits, and the empty drums and containers were sold. The remaining small containers were buried elsewhere on the Site. Drums containing solid and semi-solid substances that could not be poured out and drums containing laboratory vials and bottles were placed in piles. Some of them were buried later by the fire department in the course of extinguishing a July 1977 fire at the Site.

In addition to the Pratt & Whitney labels, there were markings on a few of the drums and/or containers found at the Site indicating that they may have come from some of the generator defendants. However, the evidence linking the generator defendants' waste to the Site is largely circumstantial.

It consists primarily of the fact that many of the dates on Davis's "receipts" correlate with dates on which the transporter depositing the waste collected waste from the generator defendants.

The waste attributed to Jersey City consisted of approximately 1,000 drums of liquid waste that had been abandoned by an unknown third party in a deserted building on a pier owned by the City. On March 3, 1977, New Jersey state officials inspected the drums, observed that some were leaking and emitting vapors, and became concerned that, among other things, the drums' contents threatened to pollute a river on which the pier was located. Accordingly, on March 21, 1977, state officials obtained a court order directing Jersey City to remove the drums forthwith. Less than a week later, the city contracted with a licensed waste disposal company to have the drums removed.

### Conclusions of Law and Supplemental Findings of Fact

I. *Rule 52(c) Standard*

Fed.R.Civ.P. 52(c) provides that:

If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence.

■■■ The Court is not obliged to rule on a Rule 52(c) motion and may instead defer entering judgment until all of the evidence has been presented. Fed.R.Civ.P. 52(c) advisory committee's note to 1991 Amendment. Unlike a motion for judgment as a matter of law in a jury case, a Rule 52(c) motion does not require the court to view the evidence in the light most favorable to the non-moving party. *Geddes v. Northwest Mo. State Univ.*, 49 F.3d 426, 429 n. 7 (8th Cir.1995); 9 James Wm. Moore et al., *Moore's Federal Practice* § 52.51, at 52–127 (3d ed.1998). Instead, in determining whether the motion should be

granted, the court independently evaluates and weighs the evidence. *International Union of Operating Eng'rs, Local Union 103 v. Indiana Constr. Corp.*, 13 F.3d 253, 257 (7th Cir.1994) (citations omitted); 9 *Moore's Federal Practice, supra*, § 52.51, at 52–127.

Judgment on partial findings is appropriate when a party making a claim has either:

1. Failed to prove one of the essential elements of its claim; or

2. Presented evidence that establishes an adverse party's defense to that claim.

9 *Moore's Federal Practice, supra*, § 52.50[2], at 52–125.

## II. *Declaratory Judgment*

### A. *Appropriateness of Declaratory Judgment*

■ A declaratory judgment allocating liability for costs to be incurred in the future is a unique creature of CERCLA. Ordinarily, courts do not adjudicate liability for damages that have not yet been sustained.

The justification for issuing a declaratory judgment in the CERCLA context derives from 42 U.S.C. § 9613(g)(2). That section provides that in an action to recover response costs, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions under section 107 [42 U.S.C. § 9607] . . . ." [10]

The statute is silent as to whether it applies also to contribution claims asserted pursuant to 42 U.S.C. § 9613(f); [11] or, whether a declaratory judgment regarding liability with respect to future costs includes a declaration fixing each party's *pro rata* share of that liability. However, several courts have held that declaratory judgments allocating liability for future response costs in a CERCLA contribution action are authorized by the Declaratory Judgment Act, 28 U.S.C. § 2201(a). *See Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 844–45 (6th Cir.1994); *Boe-*

*ing Co. v. Cascade Corp.*, 920 F.Supp. 1121, 1133 (D.Or.1996).

In this case, a declaratory judgment is appropriate for several reasons. First, there is a "substantial controversy" among the parties that is "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). A large quantity of hazardous waste was deposited at the Davis Site and there is no question that substantial cleanup costs will be incurred. Moreover, liability for those costs is hotly disputed and all of the available evidence bearing on the nature and sources of the wastes is known.

In addition, allocating liability at this time serves one of CERCLA's overriding objectives; namely, encouraging settlement of such disputes. *See* 42 U.S.C. § 9622(a); *United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 520 (1st Cir.1996); *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir.1990). Once the parties know who is liable and to what extent, the possibility of reaching a negotiated resolution will be greatly enhanced because the only remaining variable, the amount of future response costs, should be relatively easy to quantify.

### B. *Elements of Claim for Declaratory Judgment*

■ In order to prevail on its claim for declaratory judgment, UTC must prove:

1. That the defendants and UTC share a common liability for future response costs (i.e., that they are jointly and severally liable for those costs);

2. The percentage or *pro rata* share of the common liability that is attributable to each defendant; and

3. A reasonable likelihood that UTC will be required to pay more than its *pro rata* or fair share of the common liability.

---

**10.** Section 107(a)(4)(B) makes a responsible party liable for response costs incurred by "any . . . person." 42 U.S.C. § 9607(a)(4)(B).

**11.** A private PRP that has been adjudged liable or has admitted liability by entering into a settle-

ment *cannot* bring a cost recovery action under § 107; rather, it is limited to a contribution action under § 113. *See United Technologies Corp. v. Browning–Ferris Indus., Inc.*, 33 F.3d 96, 100–01 (1st Cir.1994).

*See Boeing,* 920 F.Supp. at 1140; *see also United Technologies Corp. v. Browning–Ferris Indus., Inc.,* 33 F.3d 96, 100 (1st Cir.1994) (CERCLA contribution action permits a liable or potentially liable party "to seek recoupment of that portion of his expenditures which exceeds his *pro rata* share of the overall liability"); *United States v. Taylor,* 909 F.Supp. 355, 361 (M.D.N.C.1995) (in CERCLA contribution action "the burden is on [the party seeking contribution] to prove [a PRP's] share of the damages").

Demonstrating that a defendant shares in the common liability, in turn, requires a showing that:

1. The Davis Site is a "facility";

2. There was an actual or threatened "release" of a "hazardous substance," from the Site;

3. The release or threatened release resulted or will result in "response costs" being incurred; and

4. The defendant is within one of the four categories of liable parties described in 42 U.S.C. § 9607(a)(1)-(4).

*In re Hemingway Trans., Inc.,* 993 F.2d 915, 931 (1st Cir.1993); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1150 (1st Cir.1989), *clarified* 901 F.2d 3 (1990); *United States v. Davis,* 882 F.Supp. 1217, 1220 (D.R.I.1995). *See also* 42 U.S.C. § 9601(9) (defining "facility"); § 9601(22) (defining "release"); § 9601(14) (defining "hazardous substance"); § 9601(25) (defining "response").

There is no question that the evidence presented by UTC is sufficient to establish the first three elements. The real issue is whether UTC has presented sufficient evidence to establish that each defendant falls within one of the classes of responsible parties described in 42 U.S.C. § 9607(a)(1)-(4).

UTC contends that the generator defendants are liable as arrangers under § 9607(a)(3) on the ground that they arranged for their hazardous waste to be transported to and/or disposed of at the Davis Site. UTC further contends that the transporter defendants are liable under § 9607(a)(4) on the ground that they selected the Davis Site and transported waste to it.

Finally, UTC contends that both of the Davises are liable under § 9607(a)(2) on the ground that they owned the Site and that William Davis also is liable under that section as the person who operated the facility.

### III. Transporter Liability—"Selection" of Site

 Under CERCLA, a person who transports hazardous waste to a disposal site is liable only if the site was *"selected* by such person." 42 U.S.C. § 9607(a)(4) (emphasis added); *Tippins Inc. v. USX Corp.,* 37 F.3d 87, 94 (3d Cir.1994). Although the statute does not define the term "select," it is commonly understood as meaning "to choose from a number or group." *Webster's Third New International Dictionary* 2058 (1986). Thus, a person "selecting" a site is a person who chooses that site from a group of possible sites.

 A site may be "selected" solely by the generator or owner of the waste, solely by the transporter, or jointly by both the generator and the transporter. If it appears that the transporter played no role in the decision but merely followed the generator's instructions, the transporter is not liable. *See Interstate Power Co. v. Kansas City Power & Light Co.,* 909 F.Supp. 1284, 1289 (N.D.Iowa 1994). Conversely, if the decision is left entirely to the transporter, the transporter may be liable. *See, e.g., United States v. Northeastern Pharm. & Chem. Co.,* 579 F.Supp. 823, 846–47 (W.D.Mo.1984), *rev'd in part on other grounds,* 810 F.2d 726 (8th Cir.1986).

Even if the ultimate decision is made by the generator, the transporter also may be liable if it "actively participates in the disposal decision." *Tippins,* 37 F.3d at 94. Active and substantial participation may consist, among other things, of making recommendations that are relied upon by the generator. *See B.F. Goodrich v. Betkoski,* 99 F.3d 505, 521 (2d Cir.1996) *clarified on denial of reh'g,* 112 F.3d 88 (1997), *cert. denied sub nom. Zollo Drum Co., Inc. v. B.F. Goodrich Co.,* —— U.S. ——, 118 S.Ct. 2318, 141 L.Ed.2d 694 (1998).

■ Obviously, determining whether, or to what extent, a transporter made or actively participated in the site selection decision turns on the nature of the dealings between the transporter and the generator. In this case, UTC has failed to present sufficient evidence regarding those dealings to sustain its burden of proving that Macera Brothers "selected" the Davis Site.

The fact that Cece approached Davis and made arrangements to dump at the Site could support a reasonable inference that Cece actively and substantially participated in the selection of the Site. On the other hand, it also would be reasonable to infer that Cece was acting at the direction of UTC, the generator of the waste. Ordinarily, the former inference might be more plausible. However, under these circumstances, its plausibility is eroded by the dearth of evidence regarding the dealings between the Macera defendants and UTC.

It is clear that at least some of the waste deposited at the Site by Macera Brothers belonged to UTC. The dark-colored, waxy substance deposited by Macera looked and smelled like the waste generated by UTC's Pratt & Whitney Division. In addition, it contained the same chemicals found in UTC's waste stream and some of it was in drums bearing Pratt & Whitney labels. Indeed, Judge Pettine's decision holding UTC liable for cleanup costs was based on his finding that the waxy waste was generated by UTC. *See Davis,* 882 F.Supp. at 1225. That finding is the law of the case and is binding on UTC.

Since evidence of the dealings between UTC and the Macera defendants was readily available to and under the control of UTC, UTC's failure to present that evidence or to explain why it was unable to do so, gives rise to an inference that the evidence would have been unfavorable to UTC. *See Commercial Ins. Co. of Newark, N.J. v. Gonzalez,* 512 F.2d 1307, 1314 (1st Cir.1975).

In short, the absence of evidence regarding the Macera defendants' dealings with UTC and the fact that such evidence was within UTC's control cause this Court to find that UTC has failed to establish that Macera Brothers "selected" the Davis Site. Accord-ingly, the motion for judgment on partial findings by the Macera defendants and BFI, as the alleged successor to Macera Brothers, is granted.

## IV. *Municipal Liability—the "Emergency" Exception*

■ Jersey City argues that even if it is an arranger, § 9607(d)(2) exempts it from liability. That section provides:

> No State or local government shall be liable under ... [CERCLA] for costs or damages as a result of actions taken in response to an *emergency* created by the release or threatened release of a hazardous substance generated by or from a facility owned by another person. This paragraph shall not preclude liability for costs or damages as a result of gross negligence or intentional misconduct by the State or local government. For the purpose of the preceding sentence, reckless, willful, or wanton misconduct shall constitute gross negligence.

42 U.S.C. § 9607(d)(2) (emphasis added).

Section 9607(d)(2) creates what is, in effect, an affirmative defense that Jersey City has the burden of proving. However, the undisputed facts and the evidence presented by UTC, itself, are sufficient to establish its applicability.

The parties agree that the drums removed from the pier were abandoned by an unknown third person. Moreover, UTC does not contend that Jersey City acted in a manner that could be characterized as reckless, willful, wanton or grossly negligent. On the contrary, the disposal companies with which Jersey City contracted were licensed by the State of New Jersey. Thus, the only issue presented is whether Jersey City acted "in response to an emergency."

Once again, CERCLA provides little assistance because it does not define "emergency." Nor have counsel or the Court found anything in CERCLA's legislative history or the reported cases that sheds light on the meaning to be ascribed to that term.

The dictionary defines "emergency" as "an unforeseen combination of circumstances or

the resulting state that calls for immediate action." *Webster's Third New International Dictionary* 741. Action is considered "immediate" if it is taken "without loss of time." *Id.* at 1129. The unforeseen circumstances need not require an instantaneous response in order to be deemed an emergency.

In the hazardous waste context, the existence of a severe or potentially severe environmental problem that threatens to worsen if not promptly addressed, constitutes an emergency. *See, e.g., CPC Int'l, Inc. v. Aerojet–General Corp.,* 777 F.Supp. 549, 562–63, 577 (W.D.Mich.1991) (finding that state environmental agency acted to abate environmental emergency where site was strewn with tanks of potentially explosive phosgene gas and leaking drums that were contaminating groundwater and soil with probable human carcinogens), *rev'd in part on other grounds sub nom. United States v. Cordova Chem. Co. of Mich.,* 113 F.3d 572 (6th Cir. 1997), *vacated sub nom. United States v. Bestfoods,* —— U.S. ——, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998).

That is precisely the situation that confronted Jersey City. Approximately 1,000 drums were found in an abandoned building on a city pier. Some of the drums were leaking and emitting chemical fumes that posed a safety hazard and presented a serious risk of polluting a nearby river. The need for prompt action was underscored by a court order directing the City to remove the drums forthwith. In fact, the city did act expeditiously by arranging, within a few days, for a licensed contractor to remove the drums. Thus, applying the plain meaning of the statutory language, it is clear that the situation confronting the City was an "emergency" and that the City acted promptly in response.

Application of the emergency exception to the facts of this case also is consistent with the underlying purpose of CERCLA. Although it has been said that CERCLA was intended to cast a wide net, *see Rumpke of Ind., Inc. v. Cummins Engine Co.,* 107 F.3d 1235, 1236 (7th Cir.1997); *Companies for Fair Allocation v. Axil Corp.,* 853 F.Supp. 575, 579 (D.Conn.1994), there is no indication that Congress intended the net to be so wide

as to catch and impose liability without fault on parties that did not produce the hazardous waste or derive any financial benefit from either the processes by which it was produced or its ultimate disposal.

Nor was CERCLA intended to make governmental agencies liable for good faith efforts to clean up hazardous wastes created by others. On the contrary, § 9607(d)(2) was intended to "remove[ ] a disincentive for governments to respond to emergencies covered by CERCLA." H.R.Rep. No. 99–253(I), at 73 (1985), *reprinted in* 1986 U.S.C.C.A.N. 2835, 2855; *see also Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 52 n. 4, 109 S.Ct. 2273, 2293 n. 4, 105 L.Ed.2d 1 (1989) (White, J., concurring in part and dissenting in part) (explaining that § 9607(d)(2) "was enacted by Congress to encourage state and local governments to conduct emergency cleanups of waste sites by exempting them from potential liability for those cleanup activities").

Congress's recognition that it would be unjust to impose liability on a municipality for hazardous waste problems created by others is further manifested in § 9601(20)(D) of CERCLA. That section expressly excludes municipalities from liability as owners or operators of hazardous waste facilities when they acquire ownership or control of the facilities by "abandonment, or other circumstances in which the government involuntarily acquires title by virtue of its function as sovereign." 42 U.S.C. § 9601(20)(D).

As a practical matter, there is little reason to distinguish between a situation in which a municipality acquires ownership of property containing hazardous waste because the property was abandoned to the municipality and a situation, like this one, where the hazardous waste, itself, is abandoned on property already owned by the municipality. That is a distinction without a difference.

Accordingly, the Court finds that Jersey City acted in response to an emergency caused by the release of hazardous substances generated by another; therefore, by virtue of § 9601(d)(2), it is not liable as an arranger.

## V. *Generator Liability*

 UTC alleges that the eight generator defendants are liable under § 9607(a)(3) as arrangers because they caused hazardous waste that they produced to be transported to and/or deposited at the Davis Site. In order to establish arranger liability, UTC must prove:

1. that the defendant arranged for a hazardous substance to be transported to or disposed of at the Davis Site; and

2. that there was a release or threatened release of that kind of hazardous substance; and

3. that the release or threatened release caused response costs to be incurred.

*See United States v. Monsanto,* 858 F.2d 160, 169–70 (4th Cir.1988) (referring to first two elements); *Davis,* 882 F.Supp. at 1220 (referring to second and third elements).

 As already noted, UTC relies, almost entirely, on circumstantial evidence. That is not unusual in CERCLA cases, like this one, where the dumping occurred many years ago, detailed records are unavailable, memories have dimmed, and witnesses having first-hand knowledge may either be difficult to locate or are reluctant to testify. However, those difficulties do not relieve UTC of its burden of proof.

UTC has presented evidence that each of the defendants generated hazardous wastes similar to those found at the Davis Site and that those wastes were delivered to one or more of the transporter defendants who dumped at the Davis Site. In addition, many of those deliveries occurred shortly before the dumping and under circumstances indicating that the wastes dumped included the wastes produced by the generator defendants. Finally, markings on a few containers found at the Site suggest that they may have come from some of the defendants.

In light of that evidence, the Court declines to rule on the Rule 52(c) motions of any of the generator defendants, except Giering and Waterbury Plating, until all of the evidence has been presented.

With respect to Giering and Waterbury Plating, UTC has failed to establish a *prima facie* case that their waste was deposited at the Davis Site. The evidence shows only one occasion on which Giering's waste was picked up by CWR. That pickup occurred on April 28, 1977, and consisted of twenty-four fifty-five-gallon drums containing perchloroethylene, xylene, and paint sludges. Testimony by CWR's president, Emanuel Musillo, and one of its truck drivers, Wilbert Jones, established that drums of waste collected from CWR's customers were dumped within three days of collection. Since Davis's receipts indicate that CWR made no deposits at the Site until May 13, more than two weeks later, and since CWR was dumping at two other sites (i.e., Sanitary Landfill and Picillo) during that period, there is no basis for inferring that the Giering waste picked up on April 28 was deposited at the Davis Site.

Much the same may be said with respect to Waterbury Plating. Its waste was picked up by CWR on April 6, May 4 and May 27 of 1977. However, Davis's receipts show that CWR did not begin dumping at the Site until May 13, which is before the May 27 pickup and more than three days after the April 6 and May 4 deliveries. The April 6 and May 4 deliveries both occurred more than three days before May 13, the date CWR began dumping at the Site; and it is highly unlikely that the twelve drums of waste collected on May 27 were deposited at the Davis Site.

CWR did dump seventy-nine drums of waste at the Davis Site on May 27, but Emanuel Musillo's testimony establishes that CWR did not dump drums on the same day that they were collected unless a full load of seventy-nine drums was collected early in the morning. CWR's records show that on May 27, it picked up only fifty-five drums [12] and Davis's receipts show that CWR did not dump again at the Davis Site until June 2, six days after the May 27 pickup from Waterbury Plating. Accordingly, there is nothing to support a finding that any of Waterbury Plating's waste was transported to the Davis Site.

---

12. CWR's records reveal that, besides the 12 Waterbury Plating drums, CWR picked up 12 drums from Qualitron and 31 drums from Ware Chemical.

## VI. *The Greater than Fair Share Requirement*

### A. *The Method of Calculating UTC's Fair Share*

The generator defendants argue that they are entitled to judgment because UTC has failed to establish that it has paid more than its fair share of the alleged common liability. That argument overlooks the distinction between a claim for contribution and a request for a declaratory judgment allocating liability.

■ Contribution is retrospective. It provides partial reimbursement for costs previously incurred and requires a showing that the party seeking contribution already has paid more than its fair share of the common liability. *See United Technologies,* 33 F.3d at 100 (CERCLA contribution action permits "a 'non-innocent' party (i.e., a party who himself is liable) only to seek recoupment of that portion of his expenditures which exceeds his *pro rata* share of the overall liability"); *see also* R.I. Gen. Laws § 10–6–4 ("A joint tortfeasor is not entitled to a final money judgment for contribution until he or she has by payment discharged the common liability or has paid more than his or her pro rata share of the final money judgment.").

■ On the other hand, a declaratory judgment allocating liability for future costs is, by definition, prospective. Although such an allocation may provide a basis for a later contribution claim, it is not necessary for the party seeking the allocation to demonstrate that it already has paid more than its fair share. Rather, that party must establish only a likelihood that it will have to pay more than its fair share at some future time.

■ For contribution purposes, a party's fair share of the common liability may be calculated by multiplying that party's percentage of responsibility or fault by the amount of the common liability. In this case, UTC argues that the common liability is the estimated $16.8 million in expenses that it will be required to incur pursuant to its settlement agreement with the United States. The defendants, on the other hand, argue that the common liability is the total estimated response costs of $55 million, or, at least, the total estimated cleanup cost of $49 million.

Viewing the common liability as only that portion of the cleanup cost that UTC is obliged to pay would conflict with the overriding objective of contribution which is to apportion equitably the burden of the *entire* common liability among the responsible parties. *See United Technologies,* 33 F.3d at 103 (a contribution action under CERCLA "refers to an action by a responsible party to recover from another responsible party that portion of its costs that are in excess of its *pro rata* share of the *aggregate* response costs.") (emphasis added). If a joint obligor could obtain contribution upon paying more than its aliquot share of only a discrete portion of the entire common liability, the other obligors would be exposed to the possibility of multiple liability in excess of their fair shares. For example, if UTC and the defendants each are found to be 50% responsible for the estimated $55 million in response costs, allowing UTC to obtain contribution for 50% of the $16.8 million that it is required to pay pursuant to the terms of its settlement agreement with the United States (i.e., $8.4 million) would leave the defendants liable for both their 50% share of the $16.8 million (i.e., $8.4 million) and the remaining $38.2 million in response costs (i.e., $55 million less $16.8 million).

As a result, UTC, as a party 50% responsible, would pay only 15.3% of the total response costs while the defendants, also 50% responsible, could be required to pay the remaining 84.7% without any prospect of contribution from any of the settling PRP's.[13] Such a result would be inconsistent with the equitable principles upon which the remedy of contribution rests. *See Hatco Corp. v. W.R. Grace & Co.-Conn.,* 59 F.3d 400, 413–14 (3d Cir.1995); *American Cyanamid Co. v. King Indus., Inc.,* 814 F.Supp. 209, 214 (D.R.I.1993).

13. Under 42 U.S.C. § 9613(f)(2), the other PRP's would have no right of contribution against UTC or any other PRP's that have settled with the government.

In this case, calculating UTC's *pro rata* share of the total response costs requires that the enforcement cost component and the cleanup cost component be considered separately. The $6 million in enforcement costs is attributable, almost entirely, to the Phase I litigation between the government and UTC. The defendants did not participate in that phase of the litigation and it was necessitated because UTC denied that any of its waste was deposited at the Davis Site. Accordingly, UTC bears 100% of the responsibility for those enforcement costs. As already indicated, UTC's *pro rata* share of the cleanup costs should be calculated by multiplying its percentage of liability by the total cleanup cost of $49 million. Thus, UTC's fair share of the total response costs would be the sum of those two amounts.

### B. The Likelihood that UTC Will be Required to Pay More Than its Fair Share

Having determined the proper method for calculating UTC's fair share, the only remaining question is whether UTC has established a likelihood that it will be required to pay more than that amount. Absent such a showing, allocating liability among the defendants would be a needless waste of the Court's time and the litigants' resources. The purpose of allocating responsibility for future cleanup cost is to utilize the resources of the Court and the litigants efficiently by resolving one of the most contentious issues underlying disputes over contribution, thereby facilitating settlement of those disputes, or at least simplifying any further litigation. That purpose is not served unless there is a likelihood that the party seeking an allocation will be required to pay more than its fair share (i.e., unless the event triggering a right to contribution occurs).

In this case, it is relatively easy to estimate the costs that UTC almost certainly will be required to incur in the future. Those costs consist of the approximately $14 million

in soil remediation expenses and the $2.8 million in cash that UTC must pay pursuant to its settlement agreement with the United States.[14] It also is a simple matter to calculate the amount of the common liability and the amount of the enforcement costs for which UTC is almost entirely responsible. As already noted, the cleanup cost has been estimated at approximately $49 million and the enforcement costs are $6 million.

It is far more difficult to establish UTC's fair share of the common liability. It is clear that under CERCLA, UTC bears some responsibility for the cleanup costs. As previously stated, UTC is liable as an "arranger" because some of the hazardous wastes that it generated were deposited at the Davis Site. What is not so clear is the percentage of responsibility attributable to UTC.

UTC has presented no evidence regarding its share of responsibility for the cleanup costs. On the contrary, it maintains that it bears no responsibility. The defendants argue that UTC's failure to establish its fair share precludes any finding that it is likely to pay more than its fair share in the future. However, there are several flaws in that argument.

First, requiring UTC to present evidence regarding its share of responsibility would be both impractical and unnecessary for purposes of determining whether UTC has demonstrated a likelihood that it will be obliged to pay more than its fair share of future cleanup costs. Requiring a party that is seeking contribution to act as its own adversary by presenting evidence that it was at fault creates a Catch 22.

Nor is there any need to engage in such an exercise. The judgment entered by Judge Pettine already has established that UTC is liable under CERCLA. The only remaining question is whether UTC has established a likelihood that it will be required to pay more than its fair share. That burden may be satisfied by showing that the costs that UTC

---

**14.** Under the terms of three settlement agreements that UTC has reached with other settling defendants but have not yet been approved by the Court, the overall amount that UTC will be required to pay may be reduced by a total of $6.45 million. However, the terms of these agreements do not make clear whether UTC, alone, will enjoy this benefit or whether it will have to share some of it with those settling defendants who are parties to the partial consent decree already approved by the Court.

is likely to incur are disproportionate to its share of the responsibility. Here, UTC has done that by presenting evidence that it is obligated to pay remediation expenses of approximately $16.8 million or 30.5% of the total cleanup cost while, at the same time, portraying the defendants as almost entirely responsible for these costs.

The defendants will have an opportunity to counter that evidence by, among other things, showing that UTC's *pro rata* share of liability is far greater than the amount that it will be required to pay.

### Conclusion

For all of the foregoing reasons, the motions by BFI, the Macera defendants, Jersey City, Giering and Waterbury Plating for judgment on partial findings are granted and the motions by ACCO–Bristol, Ashland, Gar, Instapak, Morton, and Perkin–Elmer for judgment on partial findings are denied.

IT IS SO ORDERED.