**MIAMI COUNTY INCINERATOR QUALIFIED TRUST,**
Plaintiff,

v.

**ACME WASTE MANAGEMENT COMPANY, et al.,**
Defendants.

No. C–3–96–101.

United States District Court,
S.D. Ohio,
Western Division.

July 21, 1999.

---

Andrew Seth Lipton, Manley, Burke, Lipton & Cook, Cincinnati, OH, for Miami County Incinerator, Qualified Trust, Bethel Township Ohio, Village of Bradford, Brown Township, Concord Township, Village of Covington, Village of Laura, Village of Ludlow Falls, Miami County OH, Monroe Township, Newberry Township, Newton Local School District, City of Piqua, Piqua City School District, Village of Pleasant Hill, Staunton Township, Tipp City Ohio, City of Troy, Troy Board of Education, plaintiffs.

John Edward Fulker, Faust, Harrelson, Fulker & McCarthy, Troy, OH, for Grissom's Market, Craig Grissom, James Grissom, Bernard Stayman, Schaefer Co., Inc., Max L. Schaefer, defendants.

Dennis Mitchell Donnelly, Troy, OH, for Hines Builders, Inc., Harold A Hines, defendants.

Constantine Dino Gianuglou, Gianuglou, Skilken & Replogle, Dayton, OH, for McGovern Builders Inc., Charles C McGovern, William Willoughby, defendants.

William Jackson Fulker, Faust, Harrelson, Fulker & McCarthy, Troy, OH, Richard Harold Wallace, Elsass Wallace Evans Schnelle, Sidney, OH, for Pence Containerized Refuse Service, defendant.

William Jackson Fulker, Faust, Harrelson, Fulker & McCarthy, Troy, OH, for Richard Pence, defendant.

Richard Harold Wallace, Elsass Wallace Evans Schnelle, Sidney, OH, for BJ Swonger, defendant.

## DECISION AND ENTRY SUSTAINING MOTION FOR SUMMARY JUDGMENT OF DEFENDANT WASTE MANAGEMENT OF OHIO, INC. (DOC. # 150); PLAINTIFF DIRECTED TO INFORM THE COURT, WITHIN 10 DAYS FROM DATE, WHETHER FINAL JUDGMENT CAN BE ENTERED IN THIS LITIGATION

RICE, Chief Judge.

The Plaintiff brings this litigation under §§ 107(a) and 113(f) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9607(a) and 9613(f), against a number of potentially responsible parties ("PRPs"). Pursuant to § 107(a), the Plaintiff seeks to recover from the Defendants the costs that it and its members have expended to remediate the Miami County Incinerator hazardous waste site ("MCI site").[1] In the alternative, the Plaintiff seeks to recover contribution for a portion of those costs, pursuant to § 113(f). In addition, the Plaintiff requests that the Court enter a declaratory judgment that the Defendants are liable for all or a portion of the remediation costs that will be incurred in the future. The MCI site began accepting waste in 1968.

---

1. In its Amended Complaint, the Plaintiff alleges that it is composed of a number of private business entities and political subdivisions of the State of Ohio. *See* Doc. # 106 at ¶ 2. The Plaintiff alleges that it and its constituent members have incurred or will incur response costs in excess of $13,500,000, to remediate the MCI site, as a result of having entered into a consent decree with the United States Environmental Protection Agency. *Id.* at ¶ 5.

Solid waste was placed in a landfill, and liquid waste was dumped into an open pit. Additionally, combustile waste was burned in an incinerator until 1974, when the license to engage in that activity was not renewed, due to a failure to meet air emission standards. The disposal of liquid waste continued until 1975. All disposal of waste at the MCI site ended in October 1978, when it was transformed into a transfer station. In 1984, the United States Environmental Protection Agency placed the MCI site on the National Priorities List.

This case is now before the Court on the Motion for Summary Judgment (Doc. # 150) filed by one of those PRPs, Defendant Waste Management of Ohio, Inc. ("WMO"). As a means of analysis, the Court will initially set forth the standards which are applicable to all motions for summary judgment, following which it will address the parties' arguments in support of and in opposition to the instant motion.

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548. *See also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.")

(quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some methaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Michigan Protection and Advocacy Service, Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified pleadings]" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the non-moving party and draw all *reasonable* inferences in the favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure,* § 2726. In ruling on a motion summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). *See also L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909 915 n. 7 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment...."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

Herein, the Plaintiff does not contend that WMO is liable under CERCLA, because of its actions with respect to the MCI site (i.e., because it disposed of waste at that site or transported waste to it); rather, the Plaintiff seeks to impose liability upon WMO on the basis of the actions of four other entities which WMO purchased, after those actions had occurred.[2] With respect to three of those entities, Avey Services, Inc. ("Avey"), Newman Container Service, Inc. ("Newman") and Pence Refuse Service "(Pence"), WMO argues that it is entitled to summary judgment, because it merely purchased the assets of those entities and that, therefore, it is not liable as their successor. With respect to the fourth, Industrial Waste Disposal, Inc. ("IWD"), WMO contends that it is entitled to summary judgment, because there is no basis for imposing liability under CERCLA upon IWD. As a means of analysis, the Court will initially discuss the parties' arguments concerning Avey, Newman and Pence, following which it will turn to their contentions regarding IWD.

*1. Avey, Newman and Pence*

██ The disposal of waste at the MCI site ended in October, 1978. WMO purchased the assets of Avey in April, 1983, of Newman in December, 1989, and of Pence in April, 1992. Therefore, WMO is liable for the actions of those three companies, only if successor liability can be imposed upon it. The parties are in agreement that, in accordance with Sixth Circuit precedent, "the liability of a successor corporation for CERCLA obligations is determined by reference to state corporation law, rather than federal common law." *City Management Corp. v. U.S. Chemical Co., Inc.,* 43 F.3d 244, 250 (6th Cir.1994), citing *Anspec Co. v. Johnson Controls,*

---

**2.** Some of those purchases were made by an affiliate of WMO. As have the parties, this Court treats each of the four transactions as having been between the particular seller (i.e., Avey, Newman, Pence or IWD) and WMO.

*Inc.,* 922 F.2d 1240, 1247 (6th Cir.1991). In addition, the parties are in agreement that this Court must resolve the matter by reference to the corporation law of Ohio. In *Welco Industries, Inc. v. Applied Cos.,* 67 Ohio St.3d 344, 617 N.E.2d 1129 (1993), the Ohio Supreme Court reiterated, in the syllabus, the circumstances under which one corporation may be held liable as a successor, for the actions of another corporation, the assets of which the former has purchased:

> A corporation that purchases the assets of another is not liable for the contractual liabilities of its predecessor corporation unless (1) the buyer expressly or impliedly agrees to assume such liability; (2) the transaction amounts to a de facto consolidation or merger; (3) the buyer corporation is merely a continuation of the seller corporation; or (4) the transaction is entered into fraudulently for the purpose of escaping liability. (*Flaugher v. Cone Automatic Machine Co.* [1987], 30 Ohio St.3d 60, 30 OBR 165, 507 N.E.2d 331, followed.)

*Id.* at 344–45, 617 N.E.2d at 1130–31. In *Flaugher v. Cone Automatic Machine Co.,* 30 Ohio St.3d 60, 507 N.E.2d 331 (1987), the Ohio Supreme Court had held, in ¶ 1 of the syllabus, that a corporation purchasing the assets of another corporation was not liable for the seller's torts, unless one of the same four conditions was met.

■ Herein, WMO argues that the evidence does not raise a genuine issue of material fact with regard to any of the four conditions under which a corporation purchasing the assets of another can be held liable. The Plaintiff does not argue to the contrary; rather, it contends that there is an additional situation under which a purchaser may be held for the actions of the seller, to wit: "the expanded view of the mere continuation test," also referred to as the "substantial continuity test." In addition, the Plaintiff contends that the evidence raises a genuine issue of material fact with regard to the question of whether

WMO can be held liable under that test. WMO, in response, argues that such test has not been adopted in Ohio. For reasons which follow, this Court agrees with WMO.

As an initial matter, the Court notes that the evidence does not raise a genuine issue of material fact concerning any of the four traditional conditions under which successor liability can be imposed upon a corporation which has purchased the assets of another. *First,* each of the three asset purchase agreements, which are attached to and authenticated by the declaration of Arthur Dudzinski ("Dudzinski"), expressly provides that WMO was not assuming any of the seller's liabilities. *Second,* in *Welco,* the Ohio Supreme Court noted that indicia of a *de facto* merger include a continuity of shareholders and the immediate or rapid dissolution of the selling corporation. Herein, it is uncontroverted that the three transactions involved the exchange of assets for cash, with none of the sellers receiving shares of stock in WMO. In addition, each of the three sellers remained in operation after its assets were sold, albeit not in the waste hauling business. *Third,* the Ohio Supreme Court has recognized that the gravamen of the non-expanded, mere continuation theory is the continuation of the corporate entity, demonstrated by a commonality of employees, officers and directors, rather than the continuation of business operations. *Flaugher,* 30 Ohio St.3d at 64, 507 N.E.2d at 336. Herein, WMO, on one hand, and the three sellers, on the other, did not share employees, officers or directors. On the contrary, WMO purchased certain assets from those three corporations, which it used to expand its exiting business. *Fourth,* there is no indication that any of the three transactions was a fraudulent effort to escape liability.

The Court also rejects Plaintiff's assertion that this Court should apply the *expanded* mere continuation test to ascertain whether WMO can be held liable as a

successor to Avey, Newman and/or Pence.[3] In *Flaugher,* a products liability action, the Ohio Supreme Court declined to adopt or to reject that test, finding that the defendant could not be liable even if the expanded version were to be adopted. In *Welco,* the Ohio Supreme Court expressly rejected the expanded mere continuation test in an action in which the plaintiff attempted to impose successor liability upon the defendant, arising out a contract into which the former had entered with a corporation that subsequently sold its assets to the defendant. In the wake of *Welco,* the Sixth Circuit and Ohio Courts of Appeals have concluded that the expanded mere continuation test is inapplicable in tort actions. *See Macdermid Inc. v. Electrochemicals, Inc.,* 142 F.3d 435, 1998 WL 165137 (6th Cir.1998); *Hunt v. Waterbury Farrel Mfg., Ltd.,* 1996 WL 697085 (Ohio App. 2 Dist. 1996); *Neal v. McGill Septic Tank Co.,* 116 Ohio App.3d 272, 688 N.E.2d 1 (1996); *Morrison v. Newaygo Engineering Survey Co.,* 1994 WL 245659 (Ohio App. 8th Dist. 1994). Moreover, in *City Management, supra,* the Sixth Circuit concluded that the expanded mere continuation test, which had been adopted by the Michigan Supreme Court for products liability cases (*see Turner v. Bituminous Casualty Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976)),[4] was inapplicable, under the law of Michigan, in a case in which the plaintiff attempted to impose liability under CERCLA against the defendant, because the latter had purchased to assets of a PRP. Given that the expanded mere continuation test is inapplicable in CERCLA cases, in a state where that theory has been recognized in products liability actions, this Court is compelled to conclude that said theory cannot be applied in a CERCLA action in this state, where the law of Ohio does not even recognize the expanded mere continuation theory in products liability actions. Accordingly, the Court concludes that the expanded mere continuation theory cannot serve as the basis for imposing liability upon WMO.[5]

■ Additionally, the Plaintiff argues that, even if WMO is not directly liable for the actions of Avey, Newman and Pence, the Court could require WMO to pay for those PRPs' shares of the response costs incurred to remediate the MCI site, as part of its (WMO's) equitable share of those costs. The Plaintiff points out that § 113(f) invests this Court with great discretion to allocate response costs between responsible parties, by using any equitable factors the Court deems to be appropriate. *See Centerior Service Co. v. Acme Scrap Iron & Metal Corp.,* 153 F.3d 344, 354 (6th Cir.1998). Additionally, Plaintiff notes that courts have frequently allocated response costs among responsible parties by employing the "Gore factors," and that orphan shares (the response costs attributable to responsible parties which have become insolvent or defunct) may be apportioned among the remaining responsible parties. *Id.* Building upon these premises, Plaintiff suggests that it may be equitable to allocate the shares of Avey, Newman

---

3. Under the expanded mere continuation test, a corporation, which has purchased the assets of another, is liable for the actions of the seller, when the purchaser shares significant features with the seller, such as continuing to produce the same products at the same facility and marketing those products under the same trade names. *See e.g., Flaugher,* 30 Ohio St.3d at 64–65, 507 N.E.2d at 336.

4. In *Flaugher,* the Ohio Supreme Court recognized *Turner* as a leading case with respect to the development of the expanded mere continuation test. 30 Ohio St.3d at 64–65, 507 N.E.2d at 336.

5. The Plaintiff has also cited *B.F. Goodrich v. Betkoski,* 99 F.3d 505 (2nd Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 2318, 141 L.Ed.2d 694 (1998), wherein the Second Circuit held that a court must apply the federal common law to determine whether a corporation purchasing the assets of another could be held liable as a successor under CERCLA. Given that the Sixth Circuit has held that state law, rather than the federal common law, supplies the legal standards to be applied when faced with that issue (*City Management, supra* ), this Court does not consider *Betkoski* to be persuasive.

and Pence to WMO, even if it is not directly liable for their actions, because it has purchased the assets of those defunct PRPs. Although the Plaintiff's argument may be persuasive, it is premature. There will be no basis for allocating any share of the response costs to WMO, unless *it* is liable under CERCLA. Above, this Court has concluded that WMO is not liable for the actions of Avey, Newman and Pence. Below, the Court considers the issue of whether WMO is liable under CERCLA for the actions of IWD. If liability cannot be imposed upon WMO for those actions, there will be no basis for allocating any share of the response costs to it (regardless of whether that share includes the shares of Avey, Newman and Pence).

The Court's point is demonstrated by considering *United States v. Atlas Minerals and Chemicals, Inc.,* 1995 WL 510304 (E.D.Pa.1995), a case upon which the Plaintiff relies. Therein, the Saucony Shoe Manufacturing Company ("Saucony I") disposed of waste from its industrial processes in the hazardous waste site at issue in that litigation. Subsequently, another entity, Saucony II, purchased the assets of Saucony I and continued its operations, including the disposal of industrial waste in that site. Thus, Saucony II was liable for contribution under CERCLA, as a responsible party, based upon its own actions and irrespective of whether it was liable as a successor to Saucony I. The District Court concluded that Saucony II was not liable as a successor to Saucony I, under the applicable principles for ascertaining whether a corporation that purchases the assets of another can be held liable for the seller's actions. However, when the District Court apportioned an equitable share of the response costs to Saucony II, it concluded that it would be equitable for that corporation to be responsible for the share of Saucony I, because the former had purchased the assets of the latter and continued its business

operations. However, the District Court did not suggest that its equitable apportionment served as the basis for imposing liability upon Saucony II in the first instance.

Accordingly, the Court sustains WMO's Motion for Summary Judgment (Doc. # 150), to the extent that, with that motion, WMO argues that it cannot be held liable for the actions of Avey, Newman and Pence, merely because it purchased the assets of those companies after they had disposed of the waste material at the MCI site.

*2. IWD*

■ After purchasing IWD, WMO merged with that entity. Therefore, there is no question that liability can be imposed on WMO for the actions of IWD. Rather than arguing to the contrary, WMO contends that it cannot be held liable, since liability could not be imposed upon IWD. Plaintiff disagrees. As an initial matter, this Court notes that, although the Plaintiff has brought this action under both § 107(a) and § 113(f) of CERCLA, its action is solely one for contribution under the latter statutory provision, since it is composed of PRPs. *See e.g., Centerior, supra* (holding that a party, which is itself partially responsible for the condition of a hazardous waste site, cannot maintain a cost recovery action, under § 107(a), against another responsible party; rather, one PRP may only obtain contribution from another PRP, pursuant to § 113(f)). However, in order to recover contribution under § 113, the plaintiff must establish that the defendant, or its predecessor, is liable under § 107(a). *Centerior,* 153 F.3d at 350. In order to establish such liability, a plaintiff must establish the following elements,[6] to wit: 1) that the defendant is within one of the four categories of potentially responsible parties set forth in

---

6. Of course, to survive a properly supported motion for summary judgment, a plaintiff need only demonstrate the existence of a genuine issue of material fact concerning each of these elements.

§ 107(a); 2) that the site is a "facility," as defined by § 101(9) of CERCLA, 42 U.S.C. § 9601(9); 3) that there has been a release or threatened release of hazardous substances at the "facility"; 4) that the plaintiff incurred necessary "response costs," responding to that release or threatened release; and 5) that the costs incurred are consistent with the national contingency plan. *Prisco v. A & D Carting Corp.,* 168 F.3d 593, 602–03 (2nd Cir. 1999); *Kalamazoo River Study Group v. Rockwell International,* 171 F.3d 1065 (6th Cir.1999); *Centerior,* 153 F.3d at 347–48.

Herein, WMO focuses exclusively upon the first element of that test, arguing that IWD did not come within the four categories of persons upon whom liability can be imposed under CERCLA.[7] Those four categories are set forth in § 107(a), which defines PRPs as:

> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, [or]
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person. . . .

42 U.S.C. § 9607(a). Plaintiff neither alleges nor argues that liability could be imposed upon IWD by virtue of paragraphs (1) through (3) of § 107(a). Plain-tiff does contend that IWD was a transporter of hazardous substances, under § 107(a)(4). The uncontroverted evidence before the Court is that IWD's relationship with the MCI site was limited to its actions of transporting waste generated by three customers (Gummed Products, Champion Paper and Decker Packing) to that site. *See* Dudzinski Deposition at 16–18; Declaration of Boyd Pearson at ¶ 9. As can be seen from the above quotation of § 107(a)(4), WMO can be liable under that statutory provision, only if IWD accepted hazardous substances for transport and, further, only if said entity selected the MCI site as the place to which those substances would be transported for disposal. *See B.F. Goodrich Co. v. Betkoski,* 99 F.3d 505, 520 (2nd Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 2318, 141 L.Ed.2d 694 (1998); *Tippins, Inc. v. USX Corp.,* 37 F.3d 87 (3rd Cir.1994); *United States v. Hardage,* 985 F.2d 1427 (10th Cir.1993). WMO argues that IWD neither accepted hazardous substances for transport, nor selected the MCI site as the place where its customers' waste, hazardous or otherwise, would be transported for disposal. For reasons which follow, the Court concludes that the evidence does not raise a genuine issue of material fact as to whether IWD selected the MCI site as the place where the waste of its customers would be disposed of; therefore, it is not necessary for the Court to consider whether that waste contained hazardous substances.

It is uncontroverted that, during the time that IWD transported waste for customers in Miami County to the MCI site, the Miami County Solid Waste District had a flow control ordinance in effect, which required that the "disposal of garbage, rubbish or refuse collected or transported by commercial haulers ... shall be made only at the Miami County Incinera-

---

**7.** Although WMO does not concede that the Plaintiff could establish the second through fifth elements of its claim, that Defendant does not argue that it is entitled to summary judgment thereon, because the evidence fails to raise a genuine issue of material fact with respect to one or more or all of those four elements.

tor...."[8] On the basis of that flow control ordinance, WMO argues that, rather than selecting the MCI site to which its customers' waste would be transported for disposal, that choice was forced upon IWD. Indeed, that flow control ordinance was enforced by employees of Miami County who would follow haulers to ensure that they did not attempt to leave that county to dispose of the waste elsewhere. *See* Declaration of Boyd Pearson (attached to Doc. #150) at ¶ 11. Moreover, haulers and the drivers they employed could be cited and fined for violating the flow control ordinance. WMO has presented uncontroverted evidence, i.e., the deposition testimony of Dudzinski, that, absent such a requirement, IWD would have disposed of the waste that it collected from customers in Miami County at a landfill owned by Danis Corporation in Montgomery County, because it would have been cheaper to do so.[9]

■ Courts have held that a transporter does not select a site, unless it actively participates in and has substantial input into the decision as to where its customers' waste would be transported for disposal. *Betkoski*, 99 F.3d at 521; *Tippins*, 37 F.3d at 94; *United States v. Davis*, 20 F.Supp.2d 326, 333 (D.R.I.1998). Although the evidence before the Court does not appear to raise a genuine issue of material fact concerning active participation or substantial input by IWD, the Plaintiff argues that IWD selected the MCI site as the place to dispose of its customers' waste, because that waste contained hazardous substances, the disposal of which the flow control ordinance did not regulate. In support of that assertion, Plaintiff notes that the flow control ordinance was adopted pursuant to the authority contained in § 343.01 of the Ohio Revised Code, which authorizes the establishment of solid waste districts, and, further, that the term "solid waste" is defined by § 3734.01(E) of the Ohio Revised Code to exclude hazardous waste. Thus, the argument continues, the flow control ordinance could not have required the disposal of hazardous substances at the MCI site, since such substances were not included within the solid waste, the disposal of which the flow control ordinance was regulating. The fundamental flaw in the Plaintiff's argument is that it relies upon the currently enacted version of § 3734.01(E), rather than that which was in effect during the period of time that waste was disposed of at the MCI site. Section 3734.01(E) was originally enacted in 1967, and through October, 1978, when the disposal of waste at the MCI site ended, that statutory provision defined solid waste to include "unwanted residual solid or semisolid material as results from industrial, commercial, agricultural or community operations, excluding earth or materials from construction, mining or demolition operations." *See* 132 Ohio Laws 1257. Simply stated, that definition is expansive enough to include all of the waste that IWD transported, even if some of that waste would now be defined to consist of hazardous substances.[10]

Alternatively, the Plaintiff argues that IWD selected the MCI site as the place at which its customers' waste would be disposed of, because it did not challenge the constitutionality of the flow control ordinance. In support of that assertion, the Plaintiff relies upon *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), wherein the Supreme Court held that a municipal flow control ordinance, which required

---

**8.** Similar ordinances were also adopted by the cities of Troy and Piqua.

**9.** At that time, IWD was owned by B.G. Danis Co., Inc.

**10.** This Court's conclusion in that regard is buttressed by the fact that it would not have

been necessary for the Ohio General Assembly to amend § 3734.01(E), to exclude hazardous substances expressly from the definition of solid waste, if the definition of that term, which is quoted above in the text, already excluded hazardous substances.

734

that all garbage generated within the town be disposed of at a particular facility, violated the dormant Commerce Clause. Assuming for sake of argument that the flow control ordinance, adopted in 1968 by the Miami County Solid Waste District, would not pass constitutional muster under *Carbone*, this Court cannot conclude that said fact is sufficient to raise a genuine issue of material fact as to whether IWD selected the MCI site as the final resting place for its customers' waste. Merely because IWD complied with the flow control ordinance, rather than adding to the eruption of litigation by filing a lawsuit challenging its constitutionality, thus anticipating the Supreme Court's decision in *Carbone* by nearly 16 years,[11] does not raise an inference that said hauler actively participated in or had substantial input into the decision to dispose of its customers' waste at the MCI site.

Accordingly, the Court sustains WMO's Motion for Summary Judgment (Doc. # 150), as it relates to the aspect of the Plaintiff's claims that arise out of the activities of IWD.

Therefore, the Court sustains WMO's Motion for Summary Judgment (Doc. # 150) in its entirety.

Since the Court has sustained, by Notation Order, the Plaintiff's Motion to Dismiss Defendants McGovern Builders, Inc., and Charles McGovern (Doc. # 160), and, further, given that the parties are no longer including Defendant Steven Newman in their certificates of service (thus raising the inference that Plaintiff has dismissed its claims against that Defendant), it may be appropriate to enter final judgment in this litigation.[12] Accordingly, the Court directs the Plaintiff to inform it, within 10 days from date, whether final judgment may be entered herein.

---

11. The Plaintiff's claims arise out of activities which occurred before October, 1978, when the disposal of waste at the MCI site stopped. The Supreme Court decided *Carbone* on May 16, 1994.

12. Other than WMO, McGovern Builders, Inc., Charles McGovern and Steven Newman were the only remaining Defendants, after the Plaintiff had voluntarily dismissed or the Court had granted summary judgment in favor of all other Defendants named in the Amended Complaint (Doc. # 106).