**CYTEC INDUSTRIES, INC., Plaintiff,**

v.

**The B.F. GOODRICH CO., Defendant.**

**No. C2–00–1398.**

United States District Court,
S.D. Ohio,
Eastern Division.

April 5, 2002.

Robert M. Robenalt, Schottenstein, Zox & Dunn, Columbus, OH, Gail H. Allyn, Pitney, Hardin, Kipp & Szuch, LLP, Morristown, NJ, for Plaintiff.

John Patrick Gartland, Vorys, Sater, Seymour & Pease, Columbus, OH, Jamie M. Haberichter, Gardner, Carton & Douglas, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

GRAHAM, District Judge.

Cytec Industries, Inc. ("Cytec") brings this action arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended by The Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 9601 *et seq.*, against The B.F. Goodrich Company ("Goodrich"). Cytec seeks to recover contribution from Goodrich, pursuant to 42 U.S.C. § 9613(f)(1), for costs it incurred in the investigation and remediation of contamination of hazardous waste at its facility in Marietta, Ohio. Cytec also seeks a declaratory judgment, pursuant to 28 U.S.C. § 2202 and 42 U.S.C. § 9613(g)(2), that Goodrich is liable for any future costs that Cytec may incur as a result of the ongoing environmental cleanup.[1] This matter is before the court on Cytec's motion for partial summary judgment on the issue of Goodrich's potential liability under CERCLA. The court heard oral argument on Cytec's motion on March 20, 2002. This motion is ripe for adjudication.

## I. STANDARD OF REVIEW

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *LaPointe v. United Autoworkers Local 600,* 8 F.3d 376, 378 (6th

---

1. The parties have stipulated to the dismissal of Cytec's other claims. *See* Doc. 17.

Cir.1993); *Osborn v. Ashland County Bd. of Alcohol, Drug Addiction & Mental Health Servs.*, 979 F.2d 1131, 1133 (6th Cir.1992)(per curium). The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact in the case at issue. *See LaPointe*, 8 F.3d at 378. In response, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339–40 (6th Cir.1993). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis added). *See generally Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1310 (6th Cir.1989).

In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir.1993)(quoting *Anderson*, 477 U.S. at 251–53, 106 S.Ct. 2505). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *See Adams v. Metiva*, 31 F.3d 375, 378 (6th Cir.1994).

## II. *FACTUAL BACKGROUND*

### A. Corporate Ownership

Cytec is a corporation organized and existing under the laws of Delaware, with its principal place of business in New Jersey. Goodrich is a New York corporation that conducts business in Richfield, Ohio. Cytec currently owns an industrial facility located in Marietta, Ohio [hereinafter "Marietta facility" or "facility"] that is the subject of this litigation. To date, Cytec has expended approximately $20 to $25 million in environmental investigation and cleanup costs for the Marietta facility. In its motion, Cytec argues that Goodrich is liable under CERCLA for the portion of costs attributable to the cleanup of hazardous waste that may have been discarded at the Marietta facility from February 6, 1926 until July 1, 1946. To better understand Cytec's claim, an in-depth review of the corporate ownership of the Marietta facility is warranted.

The Marietta Dyestuffs Company ("Dyestuffs") operated the Marietta facility from February 6, 1926 until July 1, 1946, albeit under different names. During this time, Dyestuffs manufactured dyes and various chemicals. It is Cytec's contention that during the course of Dyestuffs's operation of the Marietta facility, it released the facility's waste, including hazardous waste, into two "waste" ponds and two solid waste areas on the grounds of the facility.

American Home Products Corporation ("AHP") acquired Dyestuffs in September, 1944, thereafter holding it as a wholly owned subsidiary of AHP. In January, 1945 Dyestuffs changed its name to Marietta–Harmon Chemicals, Inc. ("Marietta–Harmon"). Approximately one month later, Marietta–Harmon merged with Harmon Color Works, Inc., which was also owned by AHP, and which had two manufacturing facilities in New Jersey. After

the merger, the Marietta facility was operated as the "Marietta Division of Marietta–Harmon."

In July, 1946 AHP sold the Marietta Division of Marietta Harmon, including the Marietta facility, to American Cyanamid Company ("Cyanamid"). Cyanamid purchased the property, assets, and business of the Marietta Division of Marietta–Harmon, but this sale did not include the purchase or acquisition of Marietta–Harmon stock, which was owned solely by AHP. After selling the Marietta Division to Cyanamid, Marietta–Harmon changed its name to Harmon Color Works, Inc. ("Harmon Color").[2]

Four years later, in 1950, Goodrich purchased 100% of the stock of Harmon Color from AHP. As a result of this purchase, Harmon Color, with its two manufacturing facilities in New Jersey, became a wholly owned subsidiary of Goodrich. On February 29, 1952 Goodrich liquidated and cancelled all of Harmon Color's stock, and Harmon Color distributed its existing assets, subject to its liabilities, to Goodrich. *See* Motion for Partial Summary Judgment, Appendix ("App."), Tab H. at pp. GR283–GR284. Beginning on March 1, 1952 Goodrich began operating the business formerly known as Harmon Color, including the two New Jersey facilities, as a division of Goodrich known as: "Harmon Color Works, a Division of the B.F. Goodrich Company." *See id.* at GR285. Harmon Color was not dissolved as a corporation under Ohio law until September 22, 1952, almost seven months after Goodrich acquired all of its assets. *See* Memorandum Contra, App. Tab G at p. CYT 2125.

Thereafter, in 1959, Goodrich sold the assets of the Harmon Color Works division to Allied Chemical Corporation ("Allied"). Goodrich acknowledges that Allied did not assume any liabilities relating to the Marietta facility as a result of this sale.

Again, Cyanamid purchased the Marietta facility from AHP on July 1, 1946, and it continued to manufacture dyes and other chemicals at the facility. In 1993, Cyanamid "spun-off" its chemicals business into a new independent corporate entity—Cytec. Cyanamid transferred ownership of the Marietta facility to Cytec, and Cytec expressly assumed all environmental liabilities associated with Cyanamid's ownership and operation of the facility from July 1, 1946 through December 17, 1993.

## B. Hazardous Waste and Environmental Cleanup

As stated, Cytec is currently in the process, and has been for at least the last ten years, of an environmental investigation and cleanup at the Marietta facility. Both the Ohio Environmental Protection Agency ("Ohio EPA") and the United States Environmental Protection Agency have required Cytec to undertake hazardous waste management activities, including formulating plans for closing hazardous waste impoundments on the grounds of the facility, as well as the actual removal of hazardous waste from the site. To date, Cytec has incurred costs of approximately $20 to $25 million as a result of these activities, and it expects to incur additional costs in the future. Cytec first became aware of the possibility that it may have to conduct an environmental cleanup of the Marietta facility's grounds in 1992 or 1993. Beginning in 1999, Cytec began to engage in interim removal of certain hazardous waste at the facility. Cytec did not provide notice to Goodrich until November, 2000.

---

**2.** Goodrich asserts that the purpose of this name change was "to reflect AHP's divestiture of the Marietta Division operations." Memorandum Contra at p. 5. The portions of the Record cited by Goodrich do not, however, support this assertion.

In its motion, Cytec describes the various chemicals produced at the Marietta facility and the process by which waste was disposed of from February 6, 1926 until July 1, 1946. *See* Motion for Partial Summary Judgment at pp. 3–12. In support of this summary, Cytec cites the deposition and affidavit testimony of two former employees of the Marietta facility, Robert Dyar and Robert Garrett. Mr. Dyar worked as a chemist, in various positions, at the Marietta facility from 1939 until at least 1946; by way of review, during this time period, the facility would have first been operated as Dyestuffs and later as the Marietta Division of Marietta–Harmon. *See id.* Appendix ("App."), Tab 3 ("Dyar Aff.") at ¶¶ 3–4. Mr. Garrett worked as a general laborer and later as a laboratory assistant at Dyestuffs from June, 1941 until September, 1942; and after spending three years in the Army, he returned to the facility in September or October, 1945 and worked for Marietta Harmon until at least July, 1946. *See id.* App., Tab 4 ("Garrett Aff.") at ¶¶ 2–3, 11, 19–21.

Goodrich does not present any evidence contradicting Cytec's account of the operations at the Marietta facility during the period of 1926 through 1946. Regarding the testimony of Messrs. Dyar and Garrett, Goodrich states: "For purposes of Cytec's motion, Goodrich does not dispute the veracity of [their] testimony[,]" but "notes that the testimony is limited to only those years that these individuals were employed at the Marietta facility...." Memorandum Contra at p. 3 n. 3.[3]

Goodrich contends that the process of disposing of waste from the Marietta facili-

ty was conducted in the same manner after Cyanamid acquired the facility from AHP on July 1, 1946. In support of this contention, Goodrich relies upon the deposition testimony of Dyar; Garrett; and another individual, Michael Nau, who presumably worked at the facility for Cyanamid and later Cytec from 1989 until 1997. *See* Memorandum Contra, Exhs. B, C, & D.[4]

## III. *DISCUSSION*

### A. Procedural Background

Cytec is seeking to recover from Goodrich, pursuant to CERCLA, the costs of the environmental investigation and cleanup that can be attributed to the hazardous waste that may have been disposed of at the Marietta facility from 1926 until July 1, 1946. In its motion for partial summary judgment, Cytec seeks a judgment that Goodrich is liable for such costs. If liable, the amount that Goodrich must contribute will be determined at trial.

Cytec's theory of liability is that when it purchased the business of the Marietta Division of Marietta–Harmon from AHP in 1946, it did not assume any of the environmental liabilities of the Marietta facility attributable to the period of 1926 until July 1, 1946 because it only acquired the assets of Marietta Division of Marietta–Harmon. Thus, according to Cytec, Harmon Color retained any liabilities arising from the Marietta facility when it sold that facility to Cyanamid. It is Cytec's contention that Goodrich assumed those liabilities when Goodrich purchased all of the stock of Harmon Color and later liquidated that stock and acquired all of Harmon Color's assets. The issue presented, therefore, is

---

3. The court also notes that the earliest point in time at which Dyar would have had personal knowledge of the operations at the Marietta facility would have been 1939, and that Garrett would have no personal knowledge of the facility's operations until 1941.

4. Goodrich only filed excerpts from Mr. Nau's deposition. A review of these excerpts reveals that Mr. Nau worked at the facility at least during the time period of 1989 until 1997.

whether Goodrich is liable as a successor corporation to the corporation that owned and operated the Marietta facility from 1926 until 1946.[5]

Cytec first moves for summary judgment on its claim that Dyestuffs/Marietta–Harmon is liable under CERCLA as a former owner and operator of the Marietta facility for a portion of the environmental cleanup that can attributed to waste that was dumped from February 6, 1926 until July 1, 1946. Cytec next moves for judgment on its claim that Goodrich is a successor corporation of Harmon Color and is therefore derivatively liable for the CERCLA liability of Dyestuffs/Marietta–Harmon.

In its memorandum contra, Goodrich does not offer any rebuttal to Cytec's argument that Dyestuffs/Marietta–Harmon is liable as a former owner and operator of the Marietta facility. Instead, it is Goodrich's contention that Cytec's motion relates only to the potential derivative liability of Goodrich. *See* Memorandum Contra at p. 1 n. 6 & p. 7 n. 6. Goodrich states that it reserves its right to challenge Cytec's assertions regarding the nature and extent of the historical operations at the Marietta facility and any underlying CERCLA liability. *See id.* at p. 7 n. 6. With respect to Cytec's assertion of Goodrich's derivative liability as an alleged successor corporation, Goodrich argues that inasmuch as Harmon Color was dissolved, any liabilities for which it was responsible died along with the corporate entity. Goodrich also asserts that in order for Cytec to prevail on its claim that Goodrich is liable for the CERCLA liability of Dyestuffs/Marietta–Harmon as a successor corporation, Cytec must establish the following two elements: (1) that Cytec did not assume the liabilities of Dyestuffs/Marietta–Harmon when it purchased the assets and business of the Marietta Division of Marietta–Harmon; and (2) that Goodrich did assume the liabilities of Dyestuffs/Marietta Harmon when it purchased from AHP 100% of the stock of Harmon Color.

In its reply memorandum, Cytec argues that because Goodrich failed to present any evidence, or argument, rebutting Cytec's assertions that Dyestuffs/Marietta–Harmon is liable under CERCLA, that portion of Cytec's motion for summary judgment is uncontested and therefore must be granted. Thus, according to Cytec, the only remaining issue for purposes of the instant motion is whether Goodrich is the corporate successor to Harmon Color.

Goodrich's failure to respond to Cytec's motion for partial summary judgment on the issue of the CERCLA liability of Dyestuffs/Marietta–Harmon is discussed *infra.*

## B. CERCLA

██ Congress enacted CERCLA to ensure the prompt cleanup of hazardous waste sites and spills by placing the ulti-

5. The complex history of the corporate ownership of the Marietta facility from February 6, 1926 until July, 1946 makes it difficult to assign a single name to the corporation or corporations that operated the facility during this time period. By way of review, Dyestuffs owned and operated the facility from 1926 until September, 1944, when AHP acquired the business and held it out as a wholly owned subsidiary. Thereafter, Dyestuffs changed its name to Marietta–Harmon Chemicals, Inc., which merged with Harmon Color Works, Inc., whereupon the entity was operated as the "Marietta Division of Marietta–Harmon." This division was sold to Cyanamid in July, 1946. Thereafter, Marietta–Harmon changed its name to Harmon Color. In an attempt to alleviate any confusion, and for purposes of this Order only, the court will refer to the entities that owned and operated the Marietta facility from 1926 until July, 1946 collectively as "Dyestuffs/Marietta–Harmon."

mate financial responsibility for the clean-up on those responsible for the improper release of hazardous waste. *See Kalamazoo River Study Group v. Menasha Corp.,* 228 F.3d 648, 652 (6th Cir.2000) [hereinafter *"KRSG"*]; *Anspec Co. v. Johnson Controls, Inc.,* 922 F.2d 1240, 1241 (6th Cir.1991); James A. King, *Kayser–Roth, Joslyn, and the Problem of Parent Corporation Liability Under CERCLA,* 25 Akron L.Rev. 123, 125 (1991) (explaining that CERCLA was enacted "to enable both federal and state environmental agencies to begin immediately cleaning up contaminated sites"). CERCLA provides two causes of action for a party to recover the costs incurred as a result of the environmental cleanup effort. *See KRSG,* 228 F.3d at 652. The first is a cost-recovery action governed by CERCLA § 107(a), codified at 42 U.S.C. § 9607(a), which provides in pertinent part:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
>
> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4) any person who accepts or accepted any hazardous substances for transport

to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

> (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
>
> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;
>
> (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and
>
> (D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

§ 9607(a). A prima facie case for cost recovery under this section is satisfied by establishing the following four elements: (1) the site is a "facility" as defined under CERCLA; (2) a release or threatened release of hazardous substances has occurred; (3) the release has caused the plaintiff to incur necessary costs of response; and (4) the defendant falls within one of the four categories of potentially responsible persons ("PRPs")[6]. *See KRSG,* 228 F.3d at 653; *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.,* 153 F.3d 344, 347–48 (6th Cir.1998).

█ The second available cause of action is one for contribution under CERCLA § 113(f), codified at 42 U.S.C. § 9613(f), which provides in relevant part:

---

**6.** The four categories of PRPs are enumerated in § 9607(a)(1)-(4), which is set forth in the body of this Order.

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

§ 9613(f)(1). A party seeking contribution under § 9613(f) must look to § 9607(a) to establish the basis and elements of the liability of the defendant. *See KRSG*, 228 F.3d at 653; *AT & T Global Info. Solutions v. Union Tank Car Co.*, 29 F.Supp.2d 857, 861 n. 4 (S.D.Ohio 1998).

■ The court notes at the outset that a plaintiff that itself is a PRP, such as Cytec, is limited to bringing a claim for contribution under § 9613(f). *See Centerior Serv. Co.*, 153 F.3d at 350–56; *Miami County Incinerator Qualified Trust v. Acme Waste Mgmt. Co.*, 61 F.Supp.2d 724, 731 (S.D.Ohio 1999). As previously explained, however, a plaintiff seeking contribution under § 9613(f) must establish the same prima facie elements required in an action for cost recovery under § 9607(a).

■ As stated, Goodrich does not present any evidence or argument rebutting Cytec's contention that it has satisfied the elements of a prima facie case of contribution under § 9613(f) in regard to Dyestuffs/Marietta–Harmon. Goodrich instead devotes its argument to its contention that it is not liable as a successor to any liabilities of Dyestuffs/Marietta–Harmon, and

Goodrich attempts to reserve its rights to challenge Cytec's assertions regarding the issue of the underlying CERCLA liability of Dyestuffs/Marietta–Harmon. The court is unaware of any such rule that allows a non-moving party to a motion for summary judgment to side-step a properly raised issue and instead reserve the right to address that issue at a later time.

It is well established that when a motion for summary judgment has been filed, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. "If the [non-moving] party does not so respond, summary judgment, if appropriate, shall be entered against the [non-moving] party." Fed.R.Civ.P. 56(e). "In a summary judgment situation, the defendant's failure to respond to the plaintiff's demonstration of a prima facie case is sufficient grounds to grant the plaintiff's motion for summary judgment." *Byrd v. Brandeburg*, 922 F.Supp. 60, 63 (N.D.Ohio 1996).

Through its motion for partial summary judgment, Cytec has demonstrated that it can satisfy the elements of a prima facie case of CERCLA contribution under § 9613(f) in regard to Dyestuffs/Marietta–Harmon. Specifically, Cytec has presented evidence demonstrating that: (1) the Marietta facility is a "facility" as defined under CERCLA, 42 U.S.C. § 9601(9)(B); (2) a release of hazardous substances occurred at the Marietta facility during its ownership and operation by Dyestuffs/Marietta–Harmon; (3) Cytec has incurred necessary response costs; and (4) Dyestuffs/Marietta–Harmon falls within one of the four categories of PRPs, to wit: Dyestuffs/Marietta Harmon owned and operated the Marietta facility from February 6, 1926 through July 1, 1946, during which time hazardous substances were disposed of; thus falling under the PRP set forth in

§ 9607(a)(2). Goodrich has failed to come forward with any evidence rebutting Cytec's prima facie case. Accordingly, this branch of Cytec's motion is granted. The entity which this court has referred to as Dyestuffs/Marietta–Harmon is liable for contribution to Cytec for the amount of environmental response costs that can be allocated to the period of February 6, 1926 until July 1, 1946. The court must now determine whether Harmon Color retained responsibility for any liabilities arising from the Marietta facility after it sold same to Cyanamid, and if so, if Goodrich assumed those liabilities by way of its transactions with Harmon Color.

## C. Successor Liability Under CERCLA

■ It is accepted in the Sixth Circuit that a successor corporation may be liable for the CERCLA liabilities of the predecessor corporation. *See City Mgmt. Corp. v. U.S. Chem. Co.,* 43 F.3d 244, 250 (6th Cir.1994) ("[T]he term 'person,' within the meaning of CERCLA § 107(a), includes successor corporations"); *Anspec Co.,* 922 F.2d at 1245 ("[W]hen Congress wrote 'corporation' in CERCLA it intended to include a successor corporation"); *Bestfoods v. Aerojet–General Corp.,* 173 F.Supp.2d 729, 757 (W.D.Mich.2001); *Miami County Incinerator Qualified Trust,* 61 F.Supp.2d at 728–29. CERCLA makes a successor corporation liable where there has been a formal merger or where all of the conditions of a *de facto* merger are present. *See Anspec Co.,* 922 F.2d at 1245.

■ "The liability of a successor corporation for CERCLA obligations is determined by reference to state corporation law, rather than federal common law." *City Mgmt. Corp.,* 43 F.3d at 250. In the instant case, both parties contend that Ohio corporation law governs in determining whether successor liability exists. The court agrees, as the CERCLA violations occurred in Ohio, the Marietta facility is located in Ohio, the waste disposed of at the Marietta facility originated in Ohio, and the Ohio EPA is involved in the cleanup effort. *See AT & T Global Info. Solutions,* 29 F.Supp.2d at 865–66.

■ Ohio follows the well-recognized rule of successor liability, which provides "that the purchaser of a corporation's assets is not liable for the debts and obligations of the seller corporation." *Welco Indus., Inc. v. Applied Cos.,* 67 Ohio St.3d 344, 617 N.E.2d 1129, 1132 (1993). Likewise, Ohio recognizes the four exceptions to the general rule of nonliability. A successor corporation may be held responsible for the liabilities of the predecessor corporation only when: (1) the buyer expressly or impliedly agrees to assume such liability; (2) the transaction amounts to a *de facto* consolidation or merger; (3) the buyer corporation is merely a continuation of the seller corporation; or (4) the transaction is entered into fraudulently for the purpose of escaping liability. *See id.*

Goodrich argues that there exists a genuine issue of fact as to whether Cyanamid acquired the liabilities of Dyestuffs/Marietta–Harmon when it purchased the assets of the Marietta Division of Marietta–Harmon from AHP. It is Goodrich's contention that Cyanamid did not merely purchase the assets of the Marietta Division of Marietta–Harmon, but instead purchased the entire business of the Marietta Division, and therefore, it argues, Cyanamid assumed the liabilities of the Marietta Division.

■ It appears that Goodrich is arguing that as a result of the transaction between Cyanamid and AHP, Cyanamid was a mere continuation of the Marietta Division of Marietta–Harmon, thereby invoking the mere continuation exception to successor nonliability. In order to invoke this exception, it must be demonstrated

that "the buyer corporation is merely a continuation of the seller corporation." *Welco,* 617 N.E.2d at 1132. "The gravamen of the traditional mere continuation exception is the continuation of the *corporate entity* rather than continuation of the business operation." *Flaugher v. Cone Automatic Mach. Co.,* 30 Ohio St.3d 60, 507 N.E.2d 331, 336 (1987) (quotation omitted). An example of a transaction in which the mere continuation exception would apply is where "one corporation sells its assets to another corporation with the same people owning both corporations. Thus, the acquiring corporation is just a new hat for, or reincarnation of, the acquired corporation." *Welco,* 617 N.E.2d at 1134. Such a transaction is tantamount to a reorganization. *See id.*

In support of its argument that the transaction between Cyanamid and AHP was more than just a purchase of assets, Goodrich cites to the minutes of AHP's Board, which read in pertinent part: "Effective July 1, 1946, the property, assets and business of Marietta [Division] were sold, transferred and assigned to American Cyanamid [Cytec] in exchange for 30,5000 shares of Cyanamid [Cytec] common stock." Memorandum Contra, Tab. A. at p. AHP 2893. Goodrich also recites a portion of a newspaper story that was quoted in the Board minutes that described the transaction, including the fact that the operation of the business would be continued under the same management. *See id.* at AHP 2893.

 That Cyanamid may have had "the same physical facilities, officers, employees, and product line" as the Marietta Division did when it was owned by AHP is not relevant. Such facts are not indicia of mere continuation. *See Welco,* 617 N.E.2d at 1134; *Kuempel Serv. Inc. v. Zofko,* 109 Ohio App.3d 591, 672 N.E.2d 1026, 1033 (1996); *Aluminum Line Prods. Co. v. Brad Smith Roofing Co.,* 109 Ohio App.3d

246, 671 N.E.2d 1343, 1356 (1996). The transaction between Cyanamid and AHP did not result in the same people owning both corporations, and after the transaction, AHP continued to exist as a viable corporation. Accordingly, the court concludes that insofar as Goodrich is relying on the mere continuation exception to the doctrine of successor nonliability, that reliance is misplaced. *See Welco,* 617 N.E.2d at 1134; *Flaugher,* 507 N.E.2d at 336.

 The court now must determine whether Goodrich assumed the liabilities of Harmon Color through its transactions with Harmon Color in 1950 and 1952. At the outset, the court notes that when Goodrich acquired the stock of Harmon Color and held Harmon Color out as a wholly owned subsidiary, Goodrich, as the parent corporation, was not liable for Harmon Color's CERCLA liability. *See United States v. Bestfoods,* 524 U.S. 51, 61–62, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). For Goodrich to be held liable for Harmon Color's CERCLA liability as the parent corporation, there would have to be justification for piercing the corporate veil. *See id.* at 62, 118 S.Ct. 1876. Cytec does not seek to hold Goodrich liable under such a theory. Instead, it is Cytec's contention that when Goodrich liquidated Harmon Color's stock, acquired all of Harmon Color's assets, and thereafter continued to operate Harmon Color's business as a new division of Goodrich, it became liable for Harmon Color's CERCLA liability under the theory of successor corporation liability.

It is Cytec's contention that through the 1952 transaction between Goodrich and Harmon Color, two of the exceptions to the general rule of successor nonliability are applicable in the case at bar, to wit: 1) that Goodrich expressly assumed all of the liabilities of Dyestuffs/Marietta–Harmon; 2) and that the transaction between Good-

rich and Harmon Color was a *de facto* merger. Goodrich, on the other hand, argues that neither of these exceptions is applicable.

Cytec first argues that Goodrich expressly assumed the liabilities of Harmon Color, including the CERCLA liabilities of Dyestuffs/Marietta–Harmon, by way of the Plan of Liquidation ("Plan") that was executed when Goodrich dissolved Harmon Color's stock and acquired its assets in February, 1952. The portion of the Plan relied upon by Cytec in support of its contention provides:

> Harmon Color Works, Inc., ... will distribute, subject to its liabilities, all of its property and assets of every kind, including its goodwill and business as a going concern, to The B.F. Goodrich Company....

Motion for Partial Summary Judgment, Tab 1, Exh. H. at p. GR284. Cytec argues that the phrase "subject to its liabilities" was an express assumption on the part of Goodrich of all of Harmon Color's liabilities. For the reasons set forth below, Cytec's argument is without merit.

■ To better understand Cytec's argument, it is necessary to recognize that "parties may contract to shift CERCLA and other environmental liabilities by means of an assumption or indemnification agreement." *White Consol. Indus., Inc. v. Westinghouse Elec. Corp.*, 179 F.3d 403, 409 (6th Cir.1999). In determining if a particular contract provision allocates responsibility for subsequently arising environmental liabilities, courts apply state law. *See id.* In *White Consol. Indus.*, the Sixth Circuit noted that Ohio courts had not addressed whether a pre-CERCLA assumption agreement can transfer CERCLA liability to the purchaser of a business. *See id.* at 409–10. The court looked to other courts that had found such a transfer of liability if the contract provision in question was "either specific enough to include CERCLA liability or general enough to include any and all environmental liability." *Id.* at 410. This court will likewise follow that formula.

Cytec compares the language of the Plan to the language found in the provisions at issue in *White Consol. Indus.* and *Aluminum Co. of Am. v. Beazer East, Inc.*, 124 F.3d 551 (3d Cir.1997) in support of its contention that the language of the Plan allocated Harmon Color's alleged CERCLA liabilities arising from Dyestuffs/Marietta–Harmon onto Goodrich. A review of the contract language at issue in those cases demonstrates that Cytec's comparison is unavailing. In *White Consol. Indus.*, the purchase agreement's assumption and liabilities provision provided: "[The Purchaser] hereby *assumes* ... all obligations and liabilities of the Business, contingent, or otherwise[.]" *White Consol. Indus.*, 179 F.3d at 409 (emphasis added). The court held that by agreeing to such language, the purchaser agreed "to assume all potential unknown liabilities related to the business[,]" including CERCLA liabilities. *Id.* at 410.

The language at issue in *Aluminum Co. of Am.* was likewise found to include CERCLA liabilities. The liquidation agreement provided: "[Beazer], for itself, its successors and assigns, fully intending to become legally bound thereby, *does hereby assume all of the liabilities and obligations of [ALT] of whatsoever nature* [.]" *Aluminum Co. of Am.*, 124 F.3d at 566. The Third Circuit held that this "clear and unambiguous pre-CERCLA provision ... [was] sufficiently broad to encompass assumption of CERCLA liabilities." *Id.*

Despite Cytec's assertions · to the contrary, the language of the Plan is *starkly* different from the language found in the two above-cited cases. Unlike the language at issue in *White Consol. Indus.* and

*Aluminum Co. of Am.,* the language in the Plan does not refer whatsoever to an assumption of liabilities or obligations. In fact, the word "assume," or any variation thereof, is not even found in the language at issue. Because of the differences between the language in the Plan and the language at issue in *White Consol. Indus.* and *Aluminum Co. of Am.,* Cytec's analogy to those cases is unconvincing. Further, as set forth below, an independent analysis of the Plan language negates the interpretation asserted by Cytec.

 Under Ohio law, if a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact for a jury. *See Inland Refuse Transfer Co. v. Browning–Ferris Indus. of Ohio, Inc.,* 15 Ohio St.3d 321, 474 N.E.2d 271, 272 (1984). It is the province of the court to determine if a contract is ambiguous. *See Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.,* 210 F.3d 672, 683–84 (6th Cir.2000) (applying Ohio law). The court concludes that the language in the Plan is not ambiguous, and that as a matter of law the language in the Plan was not an assumption, express or otherwise, of CERCLA liability on Goodrich's part.

The language of the Plan relied on by Cytec was not an assumption of liability. The phrase "subject to its liabilities" served as a qualification as to what Harmon Color was distributing to Goodrich. The sentence: "Harmon Color Works, Inc., ... will distribute, subject to its liabilities, all of its property and assets of every kind ... to [Goodrich]" plainly indicates that Harmon Color would distribute any and all property to Goodrich that remained after Harmon Color had satisfied its outstanding liabilities. Put differently, Harmon Color would first pay any outstanding debts or other liabilities out of its current assets and then distribute its remaining assets to Goodrich.

For the foregoing reasons, the court concludes as a matter of law that the Plan language did not shift onto Goodrich the CERCLA liabilities of Harmon Color. The Plan language was neither "specific enough to include CERCLA liability [nor] general enough to include any and all environmental liability." *White Consol. Indus.,* 179 F.3d at 410. In fact, the Plan language was not an assumption of any liability whatsoever. Insofar as Cytec relies on this theory in support of its argument that Goodrich is liable in contribution for CERCLA liabilities, that portion of Cytec's motion for partial summary judgment is denied.

 Cytec next argues that the dissolution of Harmon Color's stock and the concomitant transfer of its assets to Goodrich amounted to a *de facto* merger of the two companies, thereby rendering Goodrich liable as a successor corporation. *See Welco,* 617 N.E.2d at 1132. "A *de facto* merger is a transaction that results in the dissolution of the predecessor corporation and is in the nature of a total absorption of the previous business into the successor." *Id.* at 1134. The *Welco* court set forth the following "hallmarks" of a *de facto* merger:

(1) the continuation of the previous business activity and corporate personnel, (2) a continuity of shareholders resulting from a sale of assets in exchange for stock, (3) the immediate or rapid dissolution of the predecessor corporation, and (4) the assumption by the purchasing corporation of all liabilities and obligations necessary to continue the predecessor's business operations.

*Id.*

This court will turn to the "hallmarks" set forth in *Welco* to determine if the transaction between Harmon Color and Goodrich was a *de facto* merger. In applying these "hallmarks" to the transaction at

issue, the court concludes that the transaction was in effect a *de facto* merger.

The first hallmark is whether there was a continuation of the previous business activity and corporate personnel. Neither party has presented any evidence or argument as to whether there was or was not a continuation of the corporate personnel. When Goodrich dissolved Harmon Color in 1952, it continued to operate Harmon Color's two New Jersey facilities as a new division under the B.F. Goodrich Company name. Therefore, the court concludes that there was a continuation of the previous business activity.

The second hallmark is whether there was a continuity of shareholders resulting from a sale of assets in exchange for stock. In *Welco*, the Supreme Court of Ohio noted that "one court ... indicated that a transfer of assets for stock is the *sine qua non* of a de facto merger." *Welco*, 617 N.E.2d at 1134; *see also H.C.F., Inc. v. Ohio Bureau of Workers' Comp.*, 80 Ohio St.3d 642, 687 N.E.2d 763, 768 (1998) ("Moreover, no evidence establishes an assets-for-stock exchange, arguably the *sine qua non* of a *de facto* merger"). In the case at bar, there was not an assets-for-stock transaction. The absence of such a transaction does not, however, necessarily result in the conclusion that the transaction was not a *de facto* merger.

Goodrich argues that the continuity of shareholders hallmark is not satisfied because there was not an assets-for-stock transaction, and it relies heavily upon the statement in *Welco* that such a transaction is the *sine qua non* of a *de facto* merger. According to Goodrich, such a transaction is an indispensable prerequisite to the existence of a *de facto* merger. The court does not agree.

■ The Supreme Court of Ohio has never stated that it is an absolute requirement that all of the "hallmarks" of a *de facto* merger be present before concluding

that a particular transaction is in fact a *de facto* merger. Further, despite that court's acknowledgment that one court had found that an assets-for-stock transfer is the *sine qua non* of a *de facto* merger, the court has never stated that this is the *only* transaction in which there exists continuity of shareholders. A rule mandating the presence of all of the "hallmarks" of a *de facto* merger or always requiring an assets-for-stock transaction would be too rigid, as it would likely except some "transaction[s] that result[ ] in the dissolution of the predecessor corporation and [that] [are] in the nature of a total absorption of the previous business into the successor." *Welco*, 617 N.E.2d at 1134. Such a rule would dilute the *de facto* merger doctrine, which recognizes transactions that are mergers in fact without an official declaration of such. *See id.*

■ As noted by the Supreme Court of Michigan in *Turner v. Bituminous Cas. Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976), the decision from which the Supreme Court of Ohio in *Welco* obtained the "hallmarks" of a *de facto* merger, "[t]he presence of stock as consideration should be one factor to use to determine whether there exists a sufficient nexus between the successor and predecessor corporations to establish successor liability. However, *the absence of an exchange of stock should not be conclusive.*" *Turner*, 244 N.W.2d at 880 (emphasis added); *see also* 15 William Meade Fletcher *et al.*, *Fletcher Cyclopedia of the Law of Private Corporations* § 7045.10(perm.ed., rev.vol.1990) (noting that "continuity of the selling corporation can be evidenced by such things as the same management, personnel, assets, location and stockholders[,]" and that "[t]he finder of fact may also look to any other indicative of commonality"). Similarly, this court concludes that an assets-for-stock transaction is not always required in order to determine that a particular transaction was a *de facto* merger.

As a result of the transaction in question, Goodrich absorbed Harmon Color's assets and continued to operate Harmon Color's business in the same manner as Harmon Color had been operated before the transaction, with the only change being that instead of being a subsidiary of Goodrich, Harmon Color was now a division of Goodrich. Thus, this transaction resulted in the nexus between the predecessor corporation and successor corporation that the continuity of shareholders "hallmark" seeks to require, and therefore satisfies the second hallmark of a *de facto* merger.

The third hallmark of a *de facto* merger is the immediate or rapid dissolution of the predecessor corporation. Here, Harmon Color's stock was liquidated and cancelled at the same time that Goodrich acquired all of its assets. Seven months later, the corporate entity known as Harmon Color was dissolved pursuant to Ohio law. Based on these circumstances, the court concludes that the transaction between Goodrich and Harmon Color satisfied the third hallmark of a *de facto*.

The final hallmark with which the court is concerned is whether the purchasing corporation assumed all of the liabilities and obligations ordinarily necessary to continue the predecessor's business operations. Cytec relies on its argument that the language of the Plan was an express assumption of Harmon Color's liabilities by Goodrich. For the reasons discussed *supra*, the court rejects that argument. However, it is clear that Goodrich would have had to assume Harmon Color's obligations, such as contractual obligations, in order to continue the seamless operation of Harmon Color as a division of Goodrich only one day after Harmon Color's assets were distributed to Goodrich. Accordingly, the transaction satisfied this hallmark.

Goodrich's act of liquidating Harmon Color's stock, while contemporaneously acquiring Harmon Color's assets, and subsequently dissolving Harmon Color as a corporate entity under Ohio law was a *de facto* merger, as there was a total absorption of Harmon Color into Goodrich. *See Welco*, 617 N.E.2d at 1134.

The evidence submitted by Cytec demonstrates the existence of a *de facto* merger. Goodrich has failed to present any evidence creating a genuine issue of material fact on this issue. Accordingly, this branch of Cytec's motion for partial summary judgment is granted.

## IV. *CONCLUSION*

Cytec's motion for partial summary judgment is GRANTED. Cytec's motion is granted on its claim that Dyestuffs/Marietta Harmon is liable for contribution under CERCLA. Cytec's motion is likewise granted on its claim that Goodrich is responsible for the CERCLA liability of Harmon Color, which was responsible for the CERCLA liability of Dyestuffs/Marietta–Harmon on a successor liability theory. This matter shall proceed to trial on the issue of allocation of response costs on September 16, 2002.

It is so ORDERED.